**Donald Edward PERKINS,
petitioner,[1] Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. CX–95–1399.

Supreme Court of Minnesota.

Jan. 30, 1997.

**1.** Upon release of this opinion, the court was informed by appellant's counsel that appellant had died on October 23, 1996.

John M. Stuart, Minnesota State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, Catherine M. Keane, Assistant Attorney General, St. Paul, Douglas L. Ruth, Steele County Attorney, Owatonna, for Respondent.

## OPINION

ANDERSON, Justice.

Appellant Donald Edward Perkins pleaded guilty to one count of first-degree criminal sexual conduct in the rape of A.L. At the time of the sexual assault, Perkins knew he was in the full-blown stages of AIDS. Perkins entered his plea pursuant to a form plea petition which was required by local rule. The petition provided that any agreement as to sentence would be a recommendation only, and that the defendant could not withdraw the guilty plea if the court chose not to follow the recommendation. The court accepted Perkins' guilty plea, but did not impose the recommended sentence. Instead, the court imposed the statutory maximum sentence of 30 years, a greater-than-triple durational de-

parture from the presumptive sentence, and also imposed a $12,000 fine.

Seeking postconviction relief, Perkins now appeals from the lower courts' refusal to allow him to withdraw his guilty plea or to reduce his sentence to the presumptive term. Perkins also asks this court to vacate the fine. We conclude there is no manifest injustice warranting withdrawal of the guilty plea and no abuse of discretion in imposing a greater-than-triple durational departure or a $12,000 fine; therefore, we affirm.

On September 7, 1993, at approximately 3:00 p.m., Perkins entered a bar in Owatonna, Minnesota and approached A.L., who was talking to the bar owner. Perkins visited with A.L., told her that he had just moved to the area, and asked her to shoot a game of pool. Perkins and A.L. played pool and each had a couple of drinks. During their conversation, Perkins stated that he was a hair stylist and that he wanted A.L. to look at some hair styling books, offering to style her hair the next day. He also talked about two ferrets and a lizard that he had in his hotel room. At approximately 6:00 p.m., Perkins asked A.L. for a ride to his hotel because he was worried about his animals.

A.L. drove Perkins to his hotel. They entered through the main area of the hotel so that A.L. could use the restroom and Perkins could pay for another night's lodging. When A.L. came out of the restroom, she observed that Perkins had just purchased a six-pack of beer. He was "ranting and raving" because his possessions had been taken out of his room and his animals had been sent to the humane society. Upon seeing A.L., Perkins asked her to help him carry the beer to his room because his hands were full with the belongings that the hotel manager had given back to him. Once inside his room, Perkins offered A.L. a beer and either turned on the TV or put on some music. As she opened the beer and lit a cigarette, A.L. noticed that there were no hair design books and asked Perkins about them. He responded that someone must have taken them. At this point, A.L. realized that "it just seemed too fishy" and said she thought she should go, but Perkins would not let her out of the door.

Perkins told A.L. to put her purse down and to stand up. She believed that he was joking, but when she did not comply, Perkins grabbed her by the throat and told her to take her shirt off. He also told her not to scream or he would kill her. Continuing to grip A.L. by her throat, Perkins forcibly guided her to the bed, again telling her to take her shirt off. Perkins then pushed A.L. onto the bed and sat on top of her. While holding A.L. down, Perkins took his clothes off, removed A.L.'s shorts, called her a "bitch," and told her that if she did not cooperate he would kill her. During the assault, Perkins kept saying "I got your fancy underwear messed up," and continually told A.L. that she wanted to die. He also choked A.L. and hit her with a closed fist.

According to the police report, Perkins never removed A.L.'s underwear, but did penetrate her. At the time of the assault, A.L. did not know whether Perkins had ejaculated, but recalled Perkins telling her that he intended to ejaculate inside her. The test results run at the hospital after the assault revealed that Perkins did ejaculate inside her.

After Perkins completed the sexual assault, he threw A.L. on the floor and kept choking her, stating, "I should kill you. You're not the first one I've tried to kill." Perkins said that he was going to let her die just like his wife died. A.L. stated that she began to black out and everything "started flashing." At this point, A.L. believed that she was going to die, but Perkins stopped choking her, pulled her up, pushed her against the bed, and told her to take off all of her rings. He then put a pillow over her face and again said that he would kill her. He told her to take off her bra and lay down on her stomach, which she did. Perkins used A.L.'s bra to tie her arms and ankles behind her back, threatening to come back to kill her and her children if she was not quiet. Perkins then took A.L.'s money, car keys, food stamps, and jewelry; exited the room; and drove off in her car. After Perkins departed, A.L. crawled to the window, observed that her car was gone, crawled back to the phone, and dialed 911. The police arrived at the scene, and A.L. was taken to the Owatonna Hospital where she was interviewed by the police and examined by a

physician. The physician who examined A.L. stated that she had numerous bruises on her body, but found no trauma to A.L.'s vagina or anal canal.

Shortly after the assault, a state trooper saw A.L.'s car traveling south on I–35. He pursued the car to a rest area where the driver parked the car and fled. The driver left the door open, the lights on, and the engine running. The trooper was unable to apprehend the driver. The trooper examined the car and found a duffle bag containing items belonging to Perkins.

On September 9, 1993, a complaint was filed charging Perkins with two counts of first-degree criminal sexual conduct, Minn. Stat. § 609.342, subd. 1(c) (1996) (penetration under circumstances causing reasonable fear of imminent great bodily harm); *id.* at subd. 1(e)(i) (penetration using force or coercion resulting in personal injury); and one count of fifth-degree assault, *id.* § 609.224, subd. 1 (1996). Perkins was also charged with felony counts of aggravated robbery, *id.* § 609.245 (1992); kidnapping, *id.* § 609.25, subd. 1(2), (3), subd. 2(1) (1992); terroristic threats, *id.* § 609.713, subd. 1 (Supp.1993); and auto theft, *id.* § 609.52, subd. 2, subd. 3(3)(d)(v) (1992). Perkins was subsequently arrested in Nebraska on September 19, 1993 and extradited to Minnesota on September 28, 1993.

Perkins' criminal and medical records indicate that he is a 32–year–old white male who dropped out of high school after the tenth grade and has a GED. He grew up in a dysfunctional and abusive family, and was sexually molested first by his uncle at age 7 or 8, and then by his school teacher at age 11. He has been heavily involved in alcohol and drugs. He tested positive for HIV in March 1992 and has been in the full-blown stages of AIDS since March or April 1993. He has been convicted of drug and burglary offenses, but has no prior record of sex offenses.

Perkins claimed that his sexual encounter with A.L. was consensual and stated: "I met a girl, we got drunk, we had sex at the motel where I was staying. I stoled [sic] her car when she passed out. Then she hollered rape and pressed charges." Perkins claimed that he informed A.L. at least twice before any sexual contact occurred that he had HIV. He claimed that, after having sex, A.L. went to sleep and he decided to steal her car. He had no explanation for why he abandoned A.L.'s car in the rest area. He denied any guilt and claimed that the bruises on A.L.'s face and neck were inflicted by her husband during a fight. He also denied taking A.L.'s rings or telling her to be quiet or he would come back to kill her.

A.L. stated that Perkins never told her that he had HIV, and that she first learned of his illness the day after the sexual assault. A.L. stated that as a result of the assault her marriage was dissolved, she lost friends, and she was fired from her job as a clerk in a convenience store due to fear of infection and contamination of the products sold at the store. At the time of the presentence investigation, A.L. was employed as a dancer and stated that she would not be doing this type of work "if I didn't have to." She also stated that she often wondered what she would do with her children if she is, in fact, infected with HIV. In addition to the emotional and societal costs of the assault, A.L. had clinic and medical expenses that insurance did not cover. At the time of the presentence investigation, A.L. had not decided whether she would be tested for HIV.

■ On October 19, 1993, Perkins signed a plea petition form which provided that, in exchange for his entry of a *Goulette* [2] plea of guilty to first-degree criminal sexual conduct under Minn.Stat. § 609.342, subd. 1(c) (1996), the state would dismiss the remaining charges against him. Further, the state and Perkins agreed that neither side would seek a departure from the sentencing guidelines. For a severity level VIII offense, based on Perkins' criminal history score of two, the sentencing guidelines provide for a term of 105 to 115 months, with a presumptive term

---

**2.** Under *State v. Goulette,* a district court may accept a plea of guilty by an accused even though the accused maintains that he or she is innocent, provided the plea is "voluntarily, knowingly, and understandingly entered," and provided the court first questions the accused, analyzes the facts offered in support of the plea, and concludes that the evidence would support a jury verdict of guilty. 258 N.W.2d 758, 761 (Minn. 1977).

of 110 months. *See* Minnesota Sentencing Guidelines IV, V (1996).

The parties used the plea petition form required by the judges in the Third Judicial District. This form contained the printed statement: "I have been told by my attorney and I understand * * * [t]hat the maximum penalty that the court could impose for this crime (taking into consideration any prior conviction or convictions) is imprisonment for [blank] years." The number "30" was hand-written in the blank by Perkins' attorney. The plea petition also contained the following printed language:

> I have been told by my attorney and understand * * * [t]hat **the plea agreement with the prosecuting attorney as to crime charge is a** *condition* **of my entering my plea of guilty herein; if the reduction in the crime charge is not accepted I can withdraw my plea of guilty absolutely.**
>
> **However, anything in the plea agreement as to sentence (or disposition) by the judge is not a** *condition* **of my entering my plea of guilty herein; it would be merely a** *recommendation* **not binding upon the judge who sentences me (or makes any disposition) upon my plea of guilty today.** Therefore, I can not withdraw my plea of guilty if the sentencing judge disregards the prosecuting attorney's recommendation on sentence.

(Underscoring omitted; emphasis in original.)

The plea hearing occurred on the same day that Perkins signed the plea petition. In accordance with the language of the plea petition, Perkins' attorney informed the court that the state would *"suggest* to the Court to follow the presumptive sentence as stated in the sentencing guidelines." (Emphasis added.) When Perkins' attorney asked Perkins whether he understood that each of the counts in the complaint carried a maximum punishment of 30 years in prison or a $40,000 fine or both, Perkins answered yes. When the attorney asked Perkins whether he understood that by entering a *Goulette* plea to the charge of criminal sexual conduct in the first degree he would be waiving his constitutional rights, Perkins again answered yes.

The judge confirmed on the record that Perkins had heard and agreed with the statements of his attorney. Perkins also acknowledged that he was competent, that he fully understood the proceedings, and that his medications did not interfere with his ability to fully understand the proceedings.[3] Before accepting the guilty plea, Perkins also acknowledged that the judge was not bound by the sentencing recommendations contained in the plea petition. Finding that there was sufficient evidence from which a jury or fact finder could determine that there was sexual penetration of the victim and that A.L. could have reasonable fear of great bodily harm under the circumstances, the judge accepted Perkins' guilty plea on a *Goulette* basis, and dismissed the remaining counts.[4] On the morning of November 4, 1993, the date of Perkins' sentencing hearing, the judge informed counsel orally in chambers that he was considering an upward durational departure. The judge expressed his belief that both the state and Perkins should have the opportunity to call witnesses and present evidence with regard to sentencing. The state declined, and Perkins' attorney stated that he had discussed the possibility of a continuance with Perkins, but Perkins wished the sentencing hearing to take place as scheduled.

At the sentencing hearing, the state informed the court of its plea agreement not to ask for a departure in any way and affirmed its intention to stand by the agreement. The state did recommend to the court that a sentence of 115 months was "at least appropriate in this case." Perkins' attorney confirmed that neither side would be requesting an upward or downward departure. Perkins' attorney acknowledged that the judge was

---

3. Around the time of the plea hearing, Perkins' medical condition necessitated that he take various medications and visit an Owatonna medical clinic to receive medical attention.

4. In a counseling evaluation interview less than one month after the plea hearing, Perkins claimed that he pleaded guilty because he believed he would be found guilty anyway, stating that "there was no sense 'fighting it out in court.'" He said that he accepted the *Goulette* plea "because he just wanted to get out of this particular jail and begin serving his time in prison."

considering the statutory maximum of 30 years, which constituted more than triple the sentence called for in the Sentencing Guidelines. He argued that severe aggravating circumstances were not present and requested the presumptive sentence.

The judge then questioned Perkins regarding his HIV status and asked if there was anything further Perkins wished to add, but Perkins declined. The judge noted that he had discretion to impose a 30–year sentence, the statutory maximum, if he found severe aggravating factors or circumstances. The judge also noted that particularly cruel treatment of the victim is an aggravating factor under the Sentencing Guidelines.

The judge observed that "the HIV positive and AIDS is a death sentence," and noted that while Perkins denied the rape, the court had accepted his guilty plea under the facts as stated in the police reports and would sentence him according to those facts. The judge then stated the grounds for a finding of "particular cruelty" warranting upward departure:

I cannot fathom on the face of this earth if there was a more devastating offense to a victim than being sexually assaulted by a person with AIDS—I can't imagine what it would be. The victim of this offense will not know for several months whether or not she contracted the HIV virus. She might not know for years. If she does become HIV positive, it's a death sentence. The victim here will not know if she becomes pregnant, whether the child would be HIV positive or not. The victim reports that she has suffered a great deal because of this type of uncertainty. She indicates that she's lost a job because of it, lost friends, separated from her husband— the victim's impact statement, the police reports submitted in this case indicate[ ] that at several points during the ASSAULT that the victim was threatened with death, the victim was choked.

The victim was told she did not deserve to die or that she deserved to die, that she was suffocated with a pillow, choked to the point of losing consciousness. That not only her life was threatened but the life of her children was threatened if she reported the offense.

The judge then gave Perkins a 30–year sentence, ordering him to serve 20 years in the prison system and 10 years on supervised parole. After imposing the sentence, the judge stated:

But, I repeat that I can't imagine a worse position for a victim of a crime to be in than the victim of this crime and, you at the time knowing you had full-blown AIDS are the person responsible for the substantial destruction of the victim's life in this matter and therefore, the Court feels the aggravating circumstances exist and that a statutory maximum sentence is deserved in this matter.

The judge also ordered Perkins to pay a fine of $12,000, taking judicial notice of the fact that Perkins was represented by a public defender and had not had any kind of gainful employment for some period of time.

On April 20, 1994, Perkins filed a petition for postconviction relief, seeking to withdraw his guilty plea on the grounds of manifest injustice or, in the alternative, to have his sentence reduced to the presumptive term. After a hearing, the postconviction court denied Perkins' petition in its entirety. The court held that Perkins failed to show that he mistakenly believed that he could withdraw his plea if the sentencing judge rejected the recommendation. The court noted that Perkins had signed the plea petition which stated in bold letters that the judge was not bound by the recommendation, and that Perkins had responded in the affirmative when the judge told him directly that the judge did not have to follow the recommendation. In addition, the court recognized that Perkins had "ample opportunity to voice any concerns as to the plea procedure or the departure." The court held that the sentencing judge did not abuse his discretion in sentencing Perkins to the statutory maximum sentence because the judge "made specific findings regarding the aggravating factors supporting the departure." The court also held that the sentencing judge did not abuse his discretion by imposing the $12,000 fine upon Perkins because the judge "specifically considered [Perkins'] ability to pay at the time the fines were imposed."

On appeal, the Minnesota Court of Appeals affirmed in part, reversed in part, and remanded. *Perkins v. State,* 540 N.W.2d 908, 909 (1995). The court held that there was sufficient evidence to support the conclusion that Perkins' guilty plea was accurate, voluntary, and intelligent; that the plea was not influenced by the lack of appropriate medical care; and that the plea petition was not invalid because it failed to comply with the Minnesota Rules of Criminal Procedure. *Id.* at 911. The court also held that the postconviction court did not abuse its discretion by affirming the judge's imposition of a "greater-than-triple durational departure" from the presumptive sentence. *Id.* at 911–12. The court reasoned that Perkins' behavior constituted an "extremely rare case" in which a greater-than-double durational departure was justified because the "aggravating circumstances are severe." *Id.* at 912. The court stated that "the fact that Perkins had AIDS is a severe factor that, coupled with the gratuitous acts of cruelty, warrant the greater-than-triple departure." *Id.* The court agreed with Perkins, however, that the postconviction court abused its discretion when it affirmed the imposition of a $12,000 fine. *Id.* Accordingly, the court of appeals remanded to the district court to make a finding on Perkins' ability to pay the fine, holding that a court must make a finding if it imposes a fine greater than the statute's mandatory minimum. *Id.*

## I.

Perkins appeals the postconviction court's refusal to allow him to withdraw his guilty plea, its affirmance of the 30–year statutory maximum sentence, and its affirmance of the $12,000 fine. Postconviction relief is available to a person convicted of a crime, who claims that the conviction, sentence, or other disposition violated the person's legal rights. Minn.Stat. § 590.01, subd. 1 (1996). The

person petitioning for postconviction relief bears the burden of establishing the facts alleged in the petition by a fair preponderance of the evidence. Minn.Stat. § 590.04, subd. 3; *State v. Ecker,* 524 N.W.2d 712, 716 (Minn.1994); *Langer v. State,* 287 Minn. 320, 322, 178 N.W.2d 628, 630 (1970).

On appeal, our scope of review is limited to the question of whether sufficient evidence exists to support the postconviction court's findings. *Miller v. State,* 531 N.W.2d 491, 492 (Minn.1995); *Roby v. State,* 531 N.W.2d 482, 483 (Minn.1995); *Ecker,* 524 N.W.2d at 716. We will not disturb the postconviction court's decision unless that court abused its discretion. *Miller,* 531 N.W.2d at 492. If the postconviction court does make specific findings and conclusions as to each of the petitioner's claims, this court may independently review the record as to each of the claims. *See Scruggs,* 484 N.W.2d at 21, 24–25 (citing *Davis v. State,* 116 Idaho 401, 775 P.2d 1243, 1247, *pet. for rev. dismissed* (Idaho Ct.App.1989)).

A criminal defendant has no absolute right to withdraw a guilty plea once entered. *Shorter v. State,* 511 N.W.2d 743, 746 (Minn. 1994). Rather, "[a] defendant may withdraw a guilty plea after sentencing 'upon a timely motion and proof to the satisfaction of the court that withdrawal of the plea is necessary to correct a manifest injustice.'" *Ecker,* 524 N.W.2d at 715–16 (quoting Minn.R.Crim.P. 15.05, subd. 1).[5]

Perkins cites five possible grounds for a determination that the postconviction court abused its discretion when it failed to find a manifest injustice necessitating withdrawal of his guilty plea. First, he argues that the Third Judicial District's local rule requiring the use of a specific plea petition form is invalid because it conflicts with Rule 15, Minnesota Rules of Criminal Procedure, and

5. *Compare Shorter,* 511 N.W.2d at 746–47 (recognizing that manifest injustice required withdrawal of the guilty plea under the "highly unusual facts of this case" due to incomplete police investigation, defense counsel's inability to locate corroborating witnesses, sentencing court's failure to question the defendant at the plea hearing and acceptance of the plea based on leading questions, and postconviction court's failure to conduct an evidentiary hearing) *with Kim v. State,* 434 N.W.2d 263, 266 (Minn.1989) (holding that the defendant, who was questioned thoroughly about the consequences of entering his guilty plea, did not establish that withdrawal was necessary to correct a manifest injustice even though he mistakenly believed that he would not have to resign from his position as officer of a corporation if he pleaded guilty to a gross misdemeanor offense).

the plea petition forms contained therein. Second, he claims that the plea was not accurate, voluntary, and intelligent because he did not understand the difference between a recommendation as to sentence and an agreement as to sentence. Third, he contends that the plea was not voluntary and intelligent because he did not understand that the sentencing judge could depart upward from the presumptive sentence to the statutory maximum. Fourth, he asserts that his medical condition and medical problems precluded him from making an accurate, voluntary, and intelligent plea. Finally, he contends that the plea is invalid because the state dishonored its promise in the plea petition by arguing on appeal for affirmance of the sentencing judge's upward departure. We have reviewed each of these claims, and discern no grounds for reversal.

### A. Invalid Plea Petition Form

■ Perkins argues that a manifest injustice has occurred because the Third Judicial District's rule requiring the use of a specific plea petition form is invalid because it conflicts with Rule 15, Minnesota Rules of Criminal Procedure, and the plea petition forms contained therein. More specifically, he argues that he should have been permitted to sign a plea petition in the form provided for in Appendix B of rule 15.09. We conclude that, under the rules in effect when Perkins entered his plea, this argument lacks merit.

■ District court judges are free to adopt local rules of practice that are not in conflict with state rules promulgated by the Minnesota Supreme Court. *State v. Hejl,* 315 N.W.2d 592, 593 (Minn.1982) (citing Minn.Stat. § 480.055 (1996)). The authority to make local rules is both statutorily derived and recognized in case law as a practical necessity in performing the judicial function. *County of Ramsey v. Stevens,* 283 N.W.2d 918, 925 (Minn.1979). Nonetheless, in the interests of uniformity, appellate courts will either refuse to enforce or invalidate a local rule if it conflicts with a state rule. *See, e.g., Bunkowske v. Briard,* 461 N.W.2d 392, 395 (Minn.App.1990) (holding that district court's narrow application of a local rule conflicted with a state civil procedure rule); *Pearce v. Lindstrom,* 443 N.W.2d 857, 859 (Minn.App. 1989) (holding that a local rule conflicted with

a state civil procedure rule in violation of Minn.Stat. § 480.055).

The version of rule 15.09 in effect at the time of Perkins' guilty plea provided:

Upon a guilty plea to an offense punishable by incarceration, either a verbatim record of the proceedings shall be made, or in *the case of misdemeanors,* a petition to enter a plea of guilty, as provided in the Appendix B to Rule 15, shall be filed with the court.

Minn.R.Crim.P. 15.09 (1993) (emphasis added). Perkins argues that he should have been permitted to sign an Appendix B plea petition form, which provides for the withdrawal of a guilty plea if the court does not accept the agreement, rather than the plea petition form required by the Third Judicial District. Perkins misreads rule 15.09. Both the language of rule 15.09 and the plea petition form contained in Appendix B, entitled "Misdemeanor Petition to Enter Plea of Guilty," only apply to misdemeanor offenses. Perkins pleaded guilty to a felony.

It appears that Perkins failed to recognize the distinction between Appendix A and Appendix B forms. The plea petition form required by the Third Judicial District does differ from the plea petition form contained in Appendix A to rule 15, which ostensibly applies to felony offenses. The Appendix A form, simply entitled, "Petition to Enter Plea of Guilty," states that "if the court does not approve this agreement * * * I have the absolute right to withdraw my plea of guilty and have a trial." *Id.* at App. A, ¶ 20. The Third Judicial District's form adds: "[A]nything in the plea agreement as to sentence (or disposition) by the judge is not a *condition* of my entering my plea of guilty herein; it would be merely a *recommendation* not binding upon the judge who sentences me * * *" and thus "I *cannot* withdraw my plea of guilty if the sentencing judge disregards the prosecuting attorney's recommendation on sentence." (Underscoring of bold omitted, third emphasis added.) Thus, the Third Judicial District's form effectively precludes the state and the defendant from agreeing on a particular sentence, conditioned upon the defendant's ability to withdraw a guilty plea upon the sentencing judge's failure to accept the agreed-upon sentence. Perkins' attorney

explained that he used the form containing the sentencing recommendation language because he believed that the Third Judicial District judges "felt quite strongly about that language," and "probably would not have accepted" a petition with the language stricken.

Despite the differences between the Appendix A form and the Third Judicial District's form, an examination of the history of rule 15 reveals no conflict between the rule 15 in effect when Perkins entered his plea and the local rule. Enacted in 1975, rule 15 sets forth procedures for accepting guilty pleas, regulating plea discussions and plea agreements, withdrawing guilty pleas, pleading to lesser or different offenses, and making a record of guilty plea proceedings. Minn R.Crim.P. 15. Rule 15.01 lists information that the court, with the assistance of counsel, should elicit from a defendant before accepting a guilty plea. Minn.R.Crim.P. 15.01. A note following rule 15.01 states:

> (NOTE: It is desirable that the defendant also be asked to acknowledge signing the Petition to Plead Guilty, *suggested* form of which is contained in the [A]ppendix A to these rules * * *.)

*Id.* (emphasis added). In addition, the comment to rule 15 states:

> It is *suggested* by the Advisory Committee that it is *desirable* to have the defendant sign a Petition to Plead Guilty in the form of the petition appearing in the Appendices to these rules (which contain in even more detailed form the information showing the defendant's understanding of defense rights and the consequences of pleading) * * *. This petition is presently in use in some counties in Minnesota.

Minn.R.Crim.P. 15 comment (emphasis added). The rule 15 in effect when Perkins entered his guilty plea did not mandate use of the Appendix A plea petition form. Further, the note and comment clearly indicate that the Appendix A form is "suggested" and that it is "desirable" to have the defendant sign a plea petition in this form. Therefore, we conclude that when Perkins entered his guilty plea, the Third Judicial District's local rule requiring a different form in no way conflicted with rule 15.[6]

### B. Recommendation as to Sentence

 This court has recognized that a defendant who pleads guilty in exchange for an *agreed-upon* sentence faces different consequences than a defendant who exchanges a guilty plea for the state's *recommendation* of a certain sentence. *See State v. DeZeler*, 427 N.W.2d 231, 234 (Minn.1988). *DeZeler* held that if the sentencing court rejects an agreement as to a defendant's sentence, the defendant is entitled to withdraw the guilty plea. *Id.; see also State v. Wolske*, 280 Minn. 465, 473–74, 160 N.W.2d 146, 152 (1968) (allowing withdrawal of guilty plea to correct manifest injustice when state failed to abide by its promise and defendant "did not receive the benefits contemplated by the agreement"). If, conversely, the sentencing court rejects a mere "recommendation made pursuant to an agreement," then the defendant may not withdraw the plea unless the defendant can establish either (a) that the defendant mistakenly believed he or she could withdraw the plea if the sentencing court rejected the recommendation, or (b) that there is some other ground for withdrawal. *DeZeler*, 427 N.W.2d at 234.

---

6. Effective July 1, 1994, the supreme court amended the Minnesota Rules of Criminal Procedure. The rules now provide that any court is empowered to "recommend rules governing its practice" that are "not in conflict" with the Minnesota Rules of Criminal Procedure or the General Rules of Practice for the District Court. *See* Promulgation of Amendments to the Rules of Criminal Procedure, No. C1–84–2137 (Minn., May 9, 1994), *codified at* Minn.R.Crim.P. 1.03. Such rules "shall become effective as ordered by the Supreme Court." *Id.* The supreme court also amended rule 15.09 by adding the following sentence: "If a written petition to enter a plea of guilty is submitted to the court, it shall be in the appropriate form *as set forth in* Appendix A and

Appendix B to this Rule." *Id., codified at* Minn. R.Crim.P. 15.09 (emphasis added). Because Perkins' plea was entered before July 1, 1994, we need not address the validity of the Third Judicial District's local rule under the current Rules of Criminal Procedure. We note, however, that the Third Judicial District's local rule has not been approved by this court. We also point out that rule 15.09 now provides that plea petitions "shall be in the appropriate form as set forth in" the appendices to rule 15, but the note following rule 15.01 and the comment to rule 15 stating that the Appendix A form is merely "suggested" remain the same as they were before the language in rule 15.09 was changed.

██ Perkins does not argue that he mistakenly believed he could withdraw his guilty plea, and he admitted that he was never advised that he could withdraw his plea if the sentencing judge failed to follow the recommended sentence.[7] Rather, Perkins claims that his failure to understand the difference between an agreement as to sentence and a recommendation as to sentence undermined the accuracy, voluntariness, and intelligence of the plea because it led him to believe that the recommendation represented an upward limit on his potential sentence.

██ A valid guilty plea must meet "three basic prerequisites": it must be accurate, voluntary, and intelligent (i.e., knowingly and understandingly made). *State v. Trott*, 338 N.W.2d 248, 251 (Minn.1983). Manifest injustice occurs if a guilty plea is not accurate, voluntary, and intelligent, and thus the plea may be withdrawn. *See, e.g., Ecker*, 524 N.W.2d at 717 (holding that no manifest injustice occurred when defendant's plea had sufficient factual basis).

In this case, there is sufficient evidence to support a finding that Perkins did understand the difference between an agreement as to sentence and a recommendation as to sentence and, therefore, that his guilty plea was accurate, voluntary, and intelligent. The plea petition Perkins signed contains clear language explaining that the sentencing component was merely a recommendation that did not bind the court, and that Perkins could not withdraw the guilty plea upon rejection of the recommended sentence. Perkins testified that he did not read through the plea petition line-by-line, but that his attorney told him that the plea agreement was for 110 to 115 months and that if he pleaded guilty he would receive a 110- to 115-month sentence.

Perkins' testimony as to whether he understood that the plea petition contained a sentence recommendation only, and not an agreement, was equivocal:

Q. Did your attorney ever explain to you the difference between a plea agreement and a plea recommendation?

A. I believe he did.

Q. Do you know what he told you about that?

A. Just that the Judge can depart from it.

Q. Did he tell you that the Judge could depart?

A. Yes.

Q. Did he tell you that the Judge could depart once you pled guilty to this count of criminal sexual conduct in the first degree?

A. I was told he didn't have to follow the recommendation of everybody involved.

Q What did you think that meant?

A. Well when I asked what he could depart to, I was told that I really didn't need to worry about that, that the agreement was already made with the prosecutor.

Q. Did you understand that the—as far as the sentence, that that was only going to be a recommendation, that the Judge wasn't bound by that?

7. In *DeZeler*, the defendant, Mark Robert DeZeler, agreed to plead guilty and to testify against another offender in exchange for the state's recommendation of a four- or six-month upward limit on his potential sentence. 427 N.W.2d at 233. At the plea hearing, the sentencing judge told DeZeler that he would not be able to withdraw his plea regardless of the length of the sentence the judge imposed, and DeZeler said he understood. *Id.* Despite his apparent understanding, DeZeler still mistakenly believed that the judge could not impose greater than six months imprisonment. *Id.* at 234. On the day of sentencing, the parties learned that they had been mistaken as to DeZeler's criminal history score and his presumptive sentence under the guidelines. *Id.* at 235. This court held that DeZeler could withdraw his guilty plea on the ground of mutual mistake, but also indicated that the judge's confusing statement might provide alternate grounds for withdrawal of the plea. *Id.* at 234–35 (citing *State v. Loyd*, 291 Minn. 528, 530, 190 N.W.2d 123, 124 (1971) (allowing defendant to withdraw a guilty plea because defense counsel led defendant to believe he could withdraw his plea if the judge did not follow the sentencing recommendation)); *State v. Kealy*, 319 N.W.2d 25, 26 (Minn.1982) (allowing defendant to withdraw a guilty plea even after the judge stated that he was free to reject the sentencing recommendation, because the plea petition expressly retained defendant's right to withdraw the plea if the judge rejected the recommendation, and the defendant still might consistently have believed that he had a right to withdraw the plea).

A. I'm not really sure.

Perkins further testified: "I understood they were recommendations but the—according to my attorney they already made a deal for 110 to 115 months. That's all I was concerned with." But when the judge told him that 110 months was just a recommendation and that the judge was free to depart from that sentence, Perkins understood "[t]hat they had other options they could go with." After the judge informed him of his sentence, Perkins claims he did not object because "I believe the man can do anything he wants to, it's his courtroom."

Perkins' attorney's testimony supports the claim that Perkins understood that the plea petition contained a recommendation that would not bind the court. Perkins' attorney testified that he "advised [Perkins] that these were just recommendations and that they were not binding on the Court." The attorney testified that it was his standard practice to fill out the plea petition together with the defendant, to discuss the agreed-upon terms with the defendant, to explain the defendant's constitutional rights, and to ask the defendant to read the petition. He stated that some defendants have a problem understanding a recommendation as to sentence, but some do not. He stated that he did not have any concern that Perkins misunderstood the distinction between an agreement as to sentence and a recommendation as to sentence.

In *Schwerm v. State*, this court refused to permit a defendant to withdraw his guilty plea because the defendant knew that the sentencing recommendation would not bind the court. 288 Minn. 488, 491, 181 N.W.2d 867, 868 (1970). The *Schwerm* court stated: "Although a plea of guilty may be set aside where an unqualified promise is made as a part of a plea bargain, thereafter dishonored, a solemn plea of guilty should not be set aside merely because the accused has not achieved an unwarranted hope." *Id.* Similarly, Perkins merely had an "unwarranted hope" that the court would follow the recommendation. We cannot set aside his guilty plea merely because his hope was not achieved. *See also State v. Ford,* 397 N.W.2d 875, 883 (Minn.1986) ("An unachieved, unwarranted hope is not the manifest injustice which mandates plea withdrawal

here under rule 15.05 * * *."). The record does not support Perkins' claim that he failed to understand the difference between an agreement as to sentence and a recommendation as to sentence. Accordingly, there is no manifest injustice which requires us to permit a withdrawal of his guilty plea on this ground.

C. Court's Ability to Depart from Presumptive Sentence

Perkins next contends that his guilty plea was not voluntary and intelligent because he did not understand that the court could depart upward from the recommended sentence to the statutory maximum. The requirement that the plea be entered intelligently is "designed to insure that the defendant understands the charges, the rights being waived and the consequences of the guilty plea." *Brown v. State,* 449 N.W.2d 180, 182 (Minn.1989) (citing *Trott,* 338 N.W.2d at 251). One of the grounds upon which withdrawal of a guilty plea is permissible is if the defendant did not understand the consequences of the plea at the time of pleading, but we have held that withdrawal of a guilty plea is not permissible if, at the time of pleading, the defendant understood the nature and seriousness of the offense charged. *Chapman v. State,* 282 Minn. 13, 19 n. 8, 162 N.W.2d 698, 702 n. 8 (1968). A sentencing judge "has the primary responsibility for eliciting from defendant the testimony needed to establish a factual basis" for the guilty plea. *State v. Nace,* 308 Minn. 170, 171, 241 N.W.2d 101, 102 (1976). But if the record supports the conclusion that the defendant made a voluntary and intelligent plea, the defendant will not be allowed to withdraw the plea even though the sentencing judge did not ask the questions forming the factual basis, and even though the questions asked were leading questions. *Id.*

Perkins claims that he never saw a copy of the criminal complaint and does not recall being informed at arraignment that the statutory maximum for criminal sexual conduct in the first degree was 30 years imprisonment. Perkins testified that his attorney did not tell him, nor did he notice, that the maximum sentence for the offense to which

he pleaded guilty was 30 years. Perkins claims that the judge should have informed him during the plea hearing that he was facing a maximum 30-year sentence, and should have told him that serious aggravating factors were present that would justify the statutory maximum. Instead, the judge simply told him that he was free to determine what the sentence would actually be. Under these circumstances, Perkins argues that he reasonably assumed that the judge could give him anything up to the presumptive sentence. "If I thought they're even going to come close to anything, doing anything any different, I would have plead[ed] not guilty, took it to jury trial," he insisted. Perkins testified that he was not informed that the judge was considering an upward departure until "just before it happened." "If I had known that, I would have stopped everything right then," he asserted.

Despite Perkins' protestations, there is sufficient evidence to support a finding that at the time he entered his guilty plea, Perkins understood the nature and seriousness of the offense and the maximum sentence that could be imposed. The plea petition that Perkins signed states: "I have been told by my attorney and I understand * * * [t]hat the maximum penalty that the court could impose for this crime * * * is imprisonment for [blank] ["30" is handwritten in the blank] years." Perkins' attorney stated, "I know I went over the maximum punishment each offense had" with Perkins. Perkins' attorney also stated that he had recognized factors in Perkins' case that supported an upward departure, that he had structured the language in the plea agreement specifically to prevent the state from arguing for an upward departure, and that he had expressed these concerns to Perkins.

It is true that when Perkins entered his guilty plea, the judge did not directly ask him whether he knew that the court could depart upward to the statutory maximum. But Perkins did not, and could not, dispute that the plea hearing transcript reflected that his attorney informed him of the statutory maximum when he entered his plea. And, as the postconviction court concluded, Perkins had "ample opportunity to voice any concerns as to the plea procedure or the departure" at the plea hearing and at the sentencing hearing. The record supports the postconviction court's conclusion that Perkins was informed and knew the maximum punishment and that the judge could depart upward from the recommended sentence to the statutory maximum.

### D. Perkins' Medical Condition

Perkins also contends that his medical condition prevented an accurate, voluntary, and intelligent plea. *See State v. Trott*, 338 N.W.2d at 251. He claims that he made a hasty decision to plead guilty because he wanted to leave the Steele County Jail to enter a state facility where he could get appropriate medical treatment. Perkins testified that at the time of his guilty plea, both of his ears were seriously infected and his temperature was about 102 degrees, and that he was feeling "miserable" even though he was given medications for those ailments while at the jail. When asked how he felt about his treatment at the jail, Perkins stated, "I just think it could have been a little more continuous with what was going on. I tried one antibiotic, switched to another one and you know, just medications they were giving me weren't working." When asked whether the jail conditions influenced his decision to plead guilty, Perkins testified that they had "a lot to do with it" because he "was ready to get some more—little more medical attention."

Contrary to Perkins' claims, the evidence demonstrates that he did receive appropriate medical care. Perkins testified that he did not receive medical attention until four or five days after he arrived at the Steele County Jail. However, the record shows that he was taken to St. Paul Ramsey Medical Center within two days of his arrival and remained there until he tested negative for tuberculosis and was transported back to the jail. Perkins also testified that officials at the jail took him to a clinic upon request, but denied him the chance to revisit the doctor a week later when the antibiotic the clinic prescribed did not improve his condition. The sheriff, however, testified that Perkins was taken to the clinic several times, that he was never notified that Perkins was not receiving appropriate medical care at the jail, and that,

if the jail staff had had any questions about Perkins' treatment, it was jail policy to inform the sheriff or his chief deputy.

Perkins has failed to indicate how his medical complaints negate the accuracy, voluntariness, or intelligence of his guilty plea. The record shows that the Steele County Jail officials tried to meet Perkins' needs and accommodate his illness. Perkins admitted that at the time of the plea hearing he felt competent to fully understand the proceedings. He also admitted that he did not tell the court or his attorney at any point that he did not understand what was going on or that he was on any type of medication that would have affected his understanding. He had an opportunity at both the plea and sentencing hearings to express any concerns regarding his health and the guilty plea. Perkins' medical condition in no way precluded an accurate, voluntary, and intelligent plea.

### E. State's Alleged Breach of Promise

■ Perkins' fifth and most novel ground for withdrawal of his guilty plea is that his plea is invalid because the state breached its promise in the plea petition by arguing on appeal for affirmance of the upward departure. He claims that because the state took the position at the time of his guilty plea that 115 months was an appropriate sentence, the state should not now be permitted to argue for an upward departure.

■ Perkins did not raise this argument below and therefore it is not properly before this court. See Morton v. Board of Comm'rs, 301 Minn. 415, 427, 223 N.W.2d 764, 771 (1974). But even if we were to reach the merits of this argument, we would find it unconvincing. The state previously met its part of the bargain by recommending the presumptive sentence to the sentencing judge. At the sentencing hearing, the state offered the presumptive sentence as "at least appropriate in this case," but did not claim that it was the *only* appropriate sentence under the circumstances. Arguing for affirmance of the upward departure on appeal is not inconsistent with the state's sentencing recommendation. Perkins cites no case in which an appellate court has allowed a defendant to withdraw a guilty plea because the state argued for affirmance of the sentencing

court's departure from the state's recommendation on appeal. We conclude that Perkins' argument that the state breached its promise is meritless.

## II.

■ Perkins next argues that the postconviction court abused its discretion when it affirmed the statutory maximum sentence of 30 years for first-degree criminal sexual conduct, a greater-than-triple durational departure from the 110–month presumptive sentence under the sentencing guidelines. See Minn.Stat. § 609.342, subd. 2; Minnesota Sentencing Guidelines IV, V.

■ A judge should not depart from the presumptive sentence called for in the sentencing guidelines unless the judge determines that mitigating or aggravating circumstances exist that are "substantial and compelling," warranting departure. State v. Bellanger, 304 N.W.2d 282, 283 (Minn.1981); Minnesota Sentencing Guidelines II.D. A judge departing from the presumptive sentence must "provide written reasons which specify the substantial and compelling nature of the circumstances, and which demonstrate why the sentence selected in the departure is more appropriate, reasonable, or equitable than the presumptive sentence." Minnesota Sentencing Guidelines II.D.

The sentencing guidelines contain a nonexclusive list of aggravating factors that may justify upward departure. Id. at II.D.2.b. One aggravating factor is that "[t]he victim was treated with particular cruelty for which the individual offender should be held responsible." Id. at II.D.2.b(2). This court has held that "[g]ratuitous infliction of pain * * * qualifies as 'particular cruelty' within II.D.2.b(2) of the Guidelines." State v. Schantzen, 308 N.W.2d 484, 487 (Minn.1981) (holding that gratuitously spraying handcuffed robbery victims with mace constituted particular cruelty); see also State v. Cermak, 344 N.W.2d 833, 840 (Minn.1984) (holding that defendant's threat to 12–year–old sexual assault victim that he would break every bone in the boy's body if he revealed the assault constituted particularly cruel conduct).

This court has held that when "severe aggravating circumstances" exist, "the only *absolute* limit on sentence duration for the offense is that provided by the legislature in the statutory definition of the offense." *State v. Glaraton,* 425 N.W.2d 831, 834 (Minn.1988) (citing *State v. Mortland,* 399 N.W.2d 92, 94 n. 1 (Minn.1987)). This court, however, has followed a general rule that when aggravating factors justify upward departure, "the upper limit will be double the presumptive sentence length." *State v. Evans,* 311 N.W.2d 481, 483 (Minn.1981). But this rule is not absolute, because "there may well be rare cases in which the facts are so unusually compelling that an even greater degree of departure will be justified." *Id.* A determination whether "severe aggravating circumstances" exist justifying a greater-than-double durational departure (as opposed to "aggravating circumstances," which warrant up to a double durational departure) "must be based on our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *State v. Norton,* 328 N.W.2d 142, 146 (Minn.1982). Allowing greater-than-double durational departures too liberally might undermine the purpose of the sentencing guidelines to "achieve uniformity of sentencing" and to "keep[ ] the prison populations at a manageable level." *Id.* at 147. Consequently, appellate courts "should not automatically affirm all sentences imposing the statutory maximum even though some severe aggravating circumstances may exist." *Glaraton,* 425 N.W.2d at 834.

In *State v. Van Gorden,* this court held that sufficiently aggravating factors were present to justify a greater-than-triple durational departure for first-degree criminal sexual conduct when the defendant forcibly entered the 66–year–old victim's home and beat her, inflicting permanent injury, and sexually assaulted her in three different ways. 326 N.W.2d 633, 635 (Minn.1982). In *State v. Glaraton,* this court held that a greater-than-quadruple durational departure for first-degree criminal sexual assault was not excessive when the defendant sexually assaulted the victim in three different ways, engaged in gratuitous physical assault of the victim, inflicted permanent injury on the victim, made death threats, and inflicted psychological trauma. 425 N.W.2d at 833, 835. *See also id.* at 834 n. 1 (listing cases in which appellate courts have upheld greater-than-double durational departures).

Perkins argues that the sentencing judge did not review the entire record and did not base his sentence on actual facts. Rather, he claims the judge based the 30–year statutory maximum sentence on personal feelings of moral outrage and on the inference that A.L. probably contracted AIDS from Perkins' assault. Further, he argues, this case is not the "rare case" in which greater-than-double durational departure is appropriate because both the state and A.L. agreed to the presumptive sentence.

We are not persuaded by Perkins' arguments. Perkins' forcible sexual assault on A.L. occurred under "substantial and compelling" aggravating circumstances justifying upward departure from the presumptive sentence. The sentencing judge found "particular cruelty" in Perkins' death threats to A.L. and her children, his gratuitous acts of violence such as suffocating A.L. and choking her to the point of losing consciousness, and his commission of the sexual assault when he knew that he had full-blown AIDS. The judge also indicated that the aggravating circumstances were severe and noted that passing HIV to a defenseless victim equalled giving the victim a "death sentence"; thus, a greater-than-double durational departure was warranted under these facts. Forcibly raping someone while knowingly in the full-blown stages of AIDS constitutes a "rare case" and renders Perkins' crime at least as severe as those in *Van Gorden* and *Glaraton,* in which we upheld a greater-than-triple and a greater-than-quadruple durational departure. It is irrelevant that A.L.'s HIV status is unknown. It is also irrelevant that the state agreed to recommend the presumptive sentence as part of the plea bargaining process. We conclude that the postconviction court did not abuse its discretion in affirming Perkins' statutory maximum sentence.

### III.

Finally, Perkins argues that the $12,000 fine must be vacated because there was no finding that he had the financial

ability to pay the fine. Perkins points out that he was eligible for a public defender and had not been gainfully employed for a period of time, and that his medical condition may prevent him from earning money to pay the fine while incarcerated. Whether a sentencing judge must specifically find that a defendant has the ability to pay a fine before imposing the fine as part of the defendant's sentence is an issue of first impression before this court.

In *State v. Martinson,* the court of appeals analyzed its prior decisions requiring sentencing judges to consider a defendant's ability to pay before imposing costs of prosecution, and held that similar findings should be made before imposing a fine. 460 N.W.2d 342, 344 (Minn.App.1990), *pet. for rev. denied* (Minn., Oct. 25, 1990). The *Martinson* court noted that requiring such findings was consistent with the recommendations of the A.B.A. Standards for Criminal Justice. *Id.* at 343; *see* 3 A.B.A. Standards for Criminal Justice § 18–2.7 (1979). But in a subsequent case, the court of appeals held that a sentencing judge need not make findings as to a defendant's ability to pay a fine unless the judge decides to reduce the amount of the fine below the statutory minimum for the offense. *State v. Patterson,* 511 N.W.2d 476, 479 (Minn.App.1994), *pet. for rev. denied* (Minn., Mar. 31, 1994). Then, in *State v. Lambert,* 392 N.W.2d 242 (1986), the court of appeals affirmed the *Patterson* court's decision that a sentencing judge need not determine a defendant's ability to pay the statutory minimum fine. 547 N.W.2d 446, 447–48 (Minn.App.1996). Most recently, the court of appeals held that when a sentencing judge imposes a fine between the statutory maximum and the statutory minimum, the judge must find that the defendant is able to pay the fine. *State v. Salinas,* No. C6–96–180, slip. op. at 4 (Minn.App., filed Sept. 17, 1996).

In support of his claim, Perkins cites *United States v. Walker,* 900 F.2d 1201 (8th Cir. 1990). In *Walker,* the Eighth Circuit held that a district court must consider the defendant's ability to pay before imposing a fine, but the *Walker* court was construing the federal sentencing guidelines, under which such a consideration is required. *Id.* at 1206 (citing Guidelines § 5E1.2 (1988)). At the time of Perkins' sentencing, Minnesota's stat-ute provided that the judge sentencing a defendant convicted of first-degree criminal sexual conduct must impose a fine of not less than $500 nor more than the maximum fine authorized by law—here, $40,000. Minn. Stat. § 609.101, subd. 2 (Supp.1993); Minn. Stat. § 609.342 (1996). Neither the statute nor the sentencing guidelines require the judge to consider the defendant's ability to pay a fine. We recognize that the ABA Standards for Criminal Justice advocate consideration of the defendant's ability to pay before imposing a fine, but we will not read such a requirement into the statute. We therefore reverse the court of appeals on this issue, and hold that a sentencing judge need not specifically find that a defendant has the ability to pay a fine before imposing the fine as part of the defendant's sentence.

Affirmed in part, reversed in part.

PAGE and BLATZ, JJ. took no part in the consideration or decision of this case.