**STATE of Minnesota, Respondent,**

v.

**Steven Joel CAMACHO, Appellant.**

No. C8–96–293.

Supreme Court of Minnesota.

March 20, 1997.

---

John M. Stuart, Minnesota State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Attorney General, State of Minnesota, St. Paul, Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, for respondent.

## OPINION

ANDERSON, Justice.

On April 22, 1995, 14–year–old Joshua Pocock was found stabbed to death in the basement of his home. Steven Joel Camacho, a friend of the murder victim, was arrested for the murder. The day of his arrest, Camacho made several inculpatory statements to the police. Camacho was indicted for first-degree murder, and a public defender was appointed to represent him. Prior to trial, Camacho moved to suppress the inculpatory statements. The district court excluded some of the statements, but admitted others. Camacho also notified the court that he intended to raise a mental illness defense. During jury selection, Camacho dismissed his public defender and elected to represent himself. After first ruling that Camacho was not competent to waive counsel, the court reversed its ruling and held that he could proceed pro se. A jury found Camacho guilty of first-degree murder, and the court sentenced him to life imprisonment. Cama-

cho appeals his conviction on the grounds that the court erroneously admitted two of his inculpatory statements and that the court should not have permitted him to represent himself. We affirm.

Shortly before 1:00 a.m. on April 22, 1995, Marilyn Thiebault returned to her Crystal, Minnesota home to discover that her 14–year–old son, Joshua Pocock, had been stabbed to death. Joshua had been stabbed seven times, struck with a fist and the end of a knife, and choked. Police immediately focused their homicide investigation on appellant Steven Joel Camacho, a friend of Joshua's.

At approximately 7:00 a.m. that same day, Detective Russell McFarlane of the Crystal Police Department apprehended Camacho near his mother's Mendota Heights home. When apprehended, Camacho was carrying a bundle under his jacket which contained the pants he was wearing the night before. Camacho's jacket was bloodstained. Upon seeing Camacho, McFarlane drew his gun, ordered Camacho to stop, and told him not to move or he would blow his head off. Camacho stopped, and McFarlane pat-searched him and placed him under arrest. McFarlane then told Camacho "that it was over now and he was among friends," placed him in the rear of his police car, and transported him to the Crystal police station.

During the ride to the police station, McFarlane turned on his tape recorder, gave Camacho a *Miranda* warning, and proceeded to ask him if he wanted to talk. The *Miranda* warning and initial questions were as follows:

Q. Mr. Pocock [sic], the [C]onstitution requires I inform you that you have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer now and have him present now or at any time during questioning. If you cannot afford a lawyer, one will be appointed for you without cost. Do you understand?

A. Yeah.

Q. I'd like to talk with you. How do you feel about that?

A. All right.

Q. Okay. Would it be an unburdening for you?

A. Huh?

Q. Would it be an unburdening for you to talk?

A. No.

Q. No? Tell me about how it happened.

McFarlane then proceeded to ask Camacho a series of questions. In response to the questioning, Camacho told McFarlane that he and Joshua had had a sexual relationship for about four months. Joshua wanted to terminate the relationship because he had a girlfriend, but Camacho wanted his relationship with Joshua to continue. Camacho also stated that he had thought about killing Joshua for about two weeks or a month.

Camacho continued to tell McFarlane about the events on the night of the murder. Joshua had called Camacho to ask him to come over and instructed him to bring cigarettes with him. Camacho rode his bicycle from Mendota Heights to Joshua's home in Crystal. When Camacho arrived with the cigarettes, Joshua was drinking liquor. Camacho poured out the liquor and went downstairs to the basement to lie down. Joshua followed Camacho downstairs and told him to go back upstairs. Camacho then stabbed Joshua several times in the chest, back, and stomach and hit him with his fist and the knife. After the incident, Camacho rode his bicycle to a McDonald's restaurant in Robbinsdale to clean up, continued his bicycle ride home, and on the way threw the knife off a bridge in Minneapolis. Camacho told McFarlane that he was eventually going to go to the police and turn himself in. He also told McFarlane, "You should have shot me. It would have been better." Camacho then asked when he would get to go to court. This first statement ended when McFarlane and Camacho arrived at the police station.

Shortly after arriving at the police station, McFarlane again interviewed Camacho. This time, Detective David Bordwell of the Crystal Police Department was present. McFarlane turned on a tape recorder, gave Camacho another set of *Miranda* warnings, and asked if it was okay to talk.

Camacho's second statement elaborated on the first. Camacho told the detectives that he thought he had arrived at Joshua's house at approximately 10:30 p.m. He did not bring the cigarettes, so he left the house, purchased the cigarettes, and returned. When he returned, Joshua was drinking and acting intoxicated, so he chastised Joshua and poured the liquor down the drain. Joshua got mad and punched Camacho in the head. Once Camacho was downstairs in the basement, Joshua yelled at him to come upstairs, but Camacho, because he was "planning on * * * [k]illing him," said no. When Joshua came downstairs, Camacho grabbed Joshua by the shirt and accused him of telling other people about their sexual relationship. Joshua denied telling anyone but one friend. Camacho did not believe Joshua and began choking him. At that point Joshua asked Camacho, "You're going to kill me, aren't you?" and Camacho responded "Yeah." Camacho pulled the knife out of his jacket, at which time Joshua began to fight back. Camacho then stabbed Joshua, hit him in the head with the butt end of the knife, and punched him. When Camacho left the basement, Joshua was lying on the floor with his head against the couch. Camacho exited the house, took his bicycle from the backyard, and then started riding home. He thought he left Joshua's house at about 11:00 p.m.

Camacho again stated that he stopped at a McDonald's in Robbinsdale. While he was washing his hands in the McDonald's restroom, he told a McDonald's employee that he had fallen off his bicycle. After cleaning up, Camacho continued to ride home through downtown Minneapolis. He stopped along the way to throw the knife off a bridge, and arrived at his mother's house in Mendota Heights at approximately 12:30 a.m.

McFarlane asked Camacho why he had his pants bundled under his jacket when he was arrested, and Camacho replied that he had intended to throw the pants in the woods. Camacho stated that to prepare for killing Joshua he had thought about when he would have the chance to be alone with him and had written in his "tablets" about his relationship with Joshua and about "how I should go about doing it." At one point during ques-

tioning, Camacho said, "I know I'm never getting out. I—I don't deserve to be-cause—." At the close of questioning, McFarlane asked Camacho if any promises or threats were made to induce him to give the police his statement, and Camacho said no.

Later that same day, at about 2:30 p.m., Bordwell and another officer transported Camacho to the Hennepin County jail, and on the way, they attempted to look for the bridge from which Camacho threw the knife. The conversation during the ride was tape-recorded. Without prompting, Camacho asked if Joshua was really dead and commented, "I wish I wouldn't have done it." They could not locate the bridge and the knife was never found.

At approximately 4:20 p.m., Camacho was booked and fingerprinted at the Hennepin County jail. Sheriff's Deputy Brian Blaha fingerprinted Camacho. Blaha observed Camacho crying and asked what was wrong or why he was crying. Camacho replied that he had just killed his friend. Blaha instructed Camacho not to talk about the case, but Camacho continued to tell him about the murder and stated that he wished he had only punched his friend instead of stabbing him in the chest and back. Blaha asked Camacho if he wanted to use the telephone, and Camacho indicated that he did. Camacho called his mother. Blaha, listening on a second telephone, overheard Camacho make incriminating statements. Blaha then hung up the phone and Camacho continued to speak to his mother.

A grand jury indicted Camacho for first-degree murder. Camacho pleaded "[o]ne hundred percent not guilty," and a public defender was appointed to represent him. Two months before trial was to begin, Camacho notified the state that he intended to rely on the defense of mental illness or defect. Following notification, the district court ordered an examination and report of Camacho's mental condition by Dr. Carl Malmquist, a court psychiatric consultant. Dr. Malmquist concluded that Camacho "would be able to participate with his attorney to a reasonable degree or does not lack a rational

understanding as to what the charges are about."

At the Rasmussen hearing, Camacho challenged the admission of his inculpatory statements made in the presence of McFarlane, Bordwell, and Blaha. Camacho also presented the testimony of Dr. Ronald Jorgensen, a psychologist who in March 1995 had evaluated Camacho's competence to stand trial in an unrelated felony assault matter. Dr. Jorgensen testified that in October 1994, Camacho's IQ tested 82, and in September 1995, Camacho's IQ tested 79, which is frequently referred to as "borderline functioning." Dr. Jorgensen further testified that Camacho had reported some generalized dissatisfaction with life, immaturity, feelings of inadequacy, and a tendency towards low self-control, but that he believed Camacho was competent to understand and waive his constitutional rights. Dr. Jorgensen assumed that before Camacho waived certain rights, he would be able to consult with an attorney, and stated that a person with a lower IQ might need more explanation. Dr. Jorgensen. further opined that Camacho "at some point would be considered to be eligible to appear pro se."

The district court concluded that Camacho's first two inculpatory statements were admissible. The court reasoned that despite his "borderline" intelligence, Camacho understood his *Miranda* rights and his waiver of those rights was knowing, voluntary, and intelligent. With the exception of a few of his remarks which the district court considered to be "totally spontaneous," the court granted Camacho's motion to suppress the statements which Blaha overheard during the telephone call to Camacho's mother, the statements made to Blaha while at the jail, and the statements which Camacho made to Bordwell while searching for the knife.

Jury selection began on October 26, 1995. During the selection process, Camacho disagreed with his attorney several times over whether a prospective juror was qualified and objected to the presentation of a mental illness defense. Camacho asked the district court to dismiss his attorney because "he just has certain ways he wants to do things that I don't agree with, and then, he's just swearing

at me and yelling at me and stuff. * * * He told me that he didn't like me." The court denied Camacho's request, stating that he did not have the requisite skills to make a knowing and intelligent waiver of his right to counsel, and that if it were to rule otherwise, "it would be a travesty and a sham to proceed with a trial."

Later that day, the district court reversed its ruling on Camacho's request to dismiss his attorney. The court's decision to reverse its earlier ruling was based on the United States Supreme Court's decision in *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The court stated that "to apply the *Godinez* standard to this case, given a defendant who's borderline retarded with an IQ in the range of 79 to 82 is a travesty," but that it had no choice but to follow the *Godinez* standard. The court then questioned Camacho extensively regarding his wish to represent himself and the dangers of doing so. Several times, Camacho unequivocally stated that he did not want to continue to have his attorney represent him. The court also reviewed the transcript of a January 31, 1995 competency hearing and two psychological evaluations of Camacho dated March 21, 1995 (Dr. Jorgensen report) and October 13, 1995 (Dr. Malmquist report), both of which concluded that Camacho was competent to stand trial. The court stated that it was satisfied that Camacho was competent, and granted his request to discharge his attorney. The court then appointed the attorney as standby counsel.[1]

Camacho used the remainder of his peremptory challenges and challenged a number of jurors for cause, one of which was granted by the court. When the court accepted one prospective juror over Camacho's objection, Camacho called the juror "a fucking, lying bitch." After questioning this prospective juror about her ability to render a fair and impartial verdict in the case, the court allowed her to remain on the jury.

At trial, Camacho's first and second inculpatory statements and parts of the third and fourth statements were submitted to the jury. Detective McFarlane testified that he did not believe Camacho was afraid during questioning and that he thought they got along quite well. Detective Bordwell testified that at the time of Camacho's second inculpatory statement, no coercive tactics were used and Camacho expressed remorse, rather than fear, and indicated a willingness to speak. McFarlane also read several passages from Camacho's notebooks documenting Camacho's relationship with Joshua, his obsession with him, and his plans to kill him.

An employee of the Robbinsdale McDonald's testified that on April 21 he saw Camacho washing blood off his hands in the McDonald's restroom and that Camacho told him he had fallen off his bicycle. A forensic expert testified that the blood found in the basement of Joshua's home and on Camacho's jacket, pants, shoes, and socks was consistent with Joshua's blood. Another forensic expert testified that the bloodstains were consistent with Joshua's DNA. Camacho presented a DNA expert who questioned the reliability of the police's DNA testing.

Camacho testified on his own behalf and denied murdering Joshua. Camacho called Joshua's mother to the stand, against her wishes and over the state's objection, and she stated, "[T]he night I went out and you did this to my son—." Camacho called a friend to testify, who stated that over two years earlier, Camacho had sold him a knife, but did not sell him the sheath. Camacho also called three boys to testify. On cross-examination, one of the boys stated that Camacho had lied about his name and age, beat up the boy's brother and spit in his face, and harassed his mother. At the end of testimony, Camacho agreed that he had had a fair opportunity to call all of the witnesses that he felt could assist in his defense.

Throughout the trial, Camacho consulted with his standby attorney regarding evidentiary issues. The attorney frequently helped develop the record on strategic and legal questions. The district court frequently explained procedural and legal issues to Camacho, helped him subpoena witnesses, and ar-

---

1. Under Minn.R.Crim.P. 5.02, subd. 1, standby counsel must be appointed for any indigent defendant choosing self-representation in a felony matter. *State v. Richards*, 552 N.W.2d 197, 205 (Minn.1996).

ranged for him to associate with a second public defender to conduct the cross-examination of the state's DNA witnesses and the direct examination of the defense's DNA expert. At one point, Camacho stated that he no longer wanted to represent himself and wanted the second public defender to represent him. The court denied Camacho's request to be represented by the second public defender on the grounds that Camacho could not pick and choose his attorney and that the request was untimely.

During the trial, the district court repeatedly asked Camacho whether he wanted to present a defense of not guilty by reason of mental illness. At the end of testimony, the court again asked Camacho if he wanted a second phase of the trial to pursue this defense. Camacho vacillated, was at times equivocal, but finally definitively said no. On November 16, 1995, the jury found Camacho guilty of the first-degree premeditated murder of Joshua. After permitting each side the opportunity to comment, the court sentenced Camacho to life in prison.

On appeal, Camacho, now represented by the state public defender, asks this court to decide whether the district court committed reversible error by admitting the first and second inculpatory statements into evidence. He asserts that: (1) he did not validly waive his *Miranda* rights before making the statements; and (2) his low intelligence combined with police tactics rendered his statements involuntary, and their admission violated his Fourteenth Amendment due process rights. Camacho also asks this court to decide whether the court committed reversible error by allowing him to represent himself. He asserts that: (1) the court should not have permitted him to discharge his attorney and proceed pro se without ordering another competency evaluation; (2) the court erroneously found that his waiver of counsel was knowing, voluntary, and intelligent; and (3) the court erroneously failed to reevaluate his competence or revoke his self-representation during the trial. We discern no grounds for reversal and affirm.

## I.

We first address Camacho's claim that his low intelligence rendered his waiver of Fifth and Fourteenth Amendment *Miranda* rights invalid.

■ The seminal case of *Miranda v. Arizona* requires that prior to custodial interrogation, the police must warn an individual of the Fifth Amendment right to remain silent and to have counsel present during the interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467–73, 479, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966). Once the police have given these warnings, if the interrogation continues without the presence of an attorney and the police take a statement, "a heavy burden" rests on the state to demonstrate that the individual "knowingly and intelligently waived" the privilege against self-incrimination and the right to counsel. *Id.* at 475, 86 S.Ct. at 1628.

■ Ordinarily, the state will be deemed to have met its burden of proving a knowing, voluntary, and intelligent waiver of *Miranda* rights if it shows that *Miranda* warnings were given and that the individual stated that he or she understood those rights and then gave a statement. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). But if there is other evidence indicating that the waiver was not knowing, voluntary, and intelligent, the district court must make a subjective factual inquiry to determine whether, under the totality of the circumstances, the waiver was knowing, voluntary, and intelligent. *Id.* When making its inquiry, the court may consider such factors as age, maturity, intelligence, education, experience, and ability to comprehend; the lack or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; physical deprivations; and limits on the individual's access to counsel, friends, and others. *Id.* Courts may also consider other factors such as familiarity with criminal justice system, physical and mental condition, and language barriers. *See Twenty–Fifth Annual Review of Criminal Procedure*, 84 Geo. L.J.641, 861–63 (1996), and cases cited therein.

■ On appeal, the district court's conclusion that a waiver was knowing, voluntary, and intelligent will normally not be reversed unless that finding is clearly erroneous.

*Wold v. State,* 430 N.W.2d 171, 176 (Minn. 1988) (citing *State v. Kulseth,* 333 N.W.2d 635, 637 (Minn.1983)). When an appellant contends that credible evidence supports a contrary finding, however, an appellate court will make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was valid. *Id.* Despite this inquiry, the standard of review remains whether the district court's finding is clearly erroneous. *See id.* at 178.

■ Camacho argues that his low IQ, immaturity and naivete, vulnerability to pressure, and low level of functioning prevented a knowing and intelligent waiver. The state contends that despite his 11th-grade education and IQ of between 79 and 82, because Camacho had the intelligence to plan and execute a murder, he was capable of waiving his rights.

■ As stated above, an individual's intelligence is one factor to consider in determining whether a *Miranda* waiver is valid. In *Wold v. State,* the defendant claimed that his mental deficiencies, combined with his intoxication, rendered his waiver of *Miranda* rights invalid. *Id.* at 176. This court reviewed evidence that the defendant "had been intellectually 'slow' all his life," had difficulty understanding complex matters, and was on the "low range of the intelligent quotient scale," as well as psychiatric testimony that he was competent to stand trial. This court determined that the waiver was valid. *Id.* at 177–78. We said:

> Merely because an accused exhibits equivocal signs of borderline mental deficiency, or may even be suffering from a mental illness at the precise time of the waiver, those facts alone may not automatically mandate a finding of incompetence to waive.

*Id.* at 178. Under *Wold,* therefore, evidence of Camacho's borderline mental deficiency alone does not automatically mandate a finding of incompetence to waive. *Cf. Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986) (holding that mental condition, by itself and apart from its relation to official coercion, should not dispose of inquiring into constitutional "voluntariness").

The Iowa Supreme Court has held that mental subnormality itself does not bar the admission of a confession into evidence as long as the subnormality does not deprive the person of the capacity to understand the meaning and effect of the confession. *State v. Winfrey,* 221 N.W.2d 269, 273 (Iowa 1974). We note that Camacho does not meet the *Winfrey* standard because the record demonstrates that his mental subnormality, if any, did not prevent him from understanding the meaning and effect of his confessions. Dr. Jorgensen testified that Camacho had the ability to understand and competently waive his constitutional rights. Camacho had had prior contacts with police in which he was informed of his *Miranda* rights, and one of his notebook entries referred to "pleading the fifth." After his first inculpatory statement to McFarlane, he asked when he would get to go to court. During his second inculpatory statement, he commented that he was never getting out and did not deserve to. In light of these circumstances, we hold that the district court's conclusion that Camacho's waiver of his *Miranda* rights was knowing, voluntary, and intelligent is not clearly erroneous.

## II.

Next we consider whether Camacho's low intelligence, combined with police tactics, rendered his statements involuntary in violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 1; *see also* Minn. Const. art. I, § 7.

■ A defendant is deprived of due process of law under the Fourteenth Amendment when the defendant's conviction is founded upon an involuntary confession. *Jackson v. Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785–86, 12 L.Ed.2d 908 (1964). Coercive police activity is a necessary predicate to a finding that a confession is involuntary. *Connelly,* 479 U.S. at 167, 107 S.Ct. at 521–22; *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963) (holding that question is whether defendant's will was overborne by police at the time of the confession) (citation omitted). A court must look at the totality of the

circumstances to determine whether the confession is involuntary. *State v. Williams*, 535 N.W.2d 277, 287 (Minn.1995). These circumstances are the same as those a court must look at to determine whether a *Miranda* waiver has occurred. *Id.* (citations omitted). They include: the defendant's age, maturity, intelligence, education, experience, and ability to comprehend; the adequacy or lack of a warning; the length and legality of the detention; the nature of the interrogation; and whether the defendant was denied access to friends and family, or deprived of physical needs. *State v. Hince*, 540 N.W.2d 820, 824 (Minn.1995).

The state has the burden of proving that a confession was voluntary by a preponderance of the evidence. *State v. Andrews*, 388 N.W.2d 723, 730 (Minn.1986). It is the appellate court's duty to examine the entire record and to make an independent determination whether a confession was voluntarily given. *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966).

Camacho argues that his inculpatory statements to McFarlane should have been suppressed because his low IQ, naivete, and inability to comprehend, combined with the police's threatening behavior, demonstrated that the confessions were involuntary. The police's allegedly threatening behavior is a combination of: McFarlane telling Camacho at the time he was apprehended to stop or he would blow his head off, McFarlane telling him it was over and he was among friends; McFarlane "possibly kicking his legs apart" during the pat-search; McFarlane allegedly commanding Camacho to tell him about how it happened after the first *Miranda* warning; and the allegation that Camacho was not given an opportunity to use the telephone, to eat or drink, or to use the bathroom during the interrogation.

Despite Camacho's low IQ, the totality of the circumstances supports the conclusion that his will was not overborne by the police's behavior. McFarlane testified that when arresting Camacho, he only called out a command to see how Camacho would respond to verbal commands and to establish an atmosphere of authority. After Camacho complied, McFarlane followed standard procedure by pat-searching Camacho. The district court described the tone and inflection of McFarlane's "tell me about how it happened" as "not coercive" and "quite gentle." Even if McFarlane's intonation was a device to gain Camacho's trust, this is not the kind of coercive police tactic that will render a confession involuntary. From the time of Camacho's arrest shortly after 7:00 a.m. and the ending of the second statement at 8:24 a.m., Camacho did not make any phone calls, was not offered anything to eat or drink, and was not asked if he had to go to the bathroom. But this was less than one and one-half hours, and Camacho was not prevented from using the phone or bathroom, eating or drinking. McFarlane and Bordwell later testified, and Camacho acknowledged at the conclusion of his second statement, that no promises or threats had been made to induce him to talk. At trial, Camacho was asked what caused him to falsely confess to a murder, and he replied, "Nothing, I was just scared."

Upon examining the record, we conclude that Camacho's first and second inculpatory statements were voluntarily made and that the district court did not err in admitting them into evidence.

### III.

The next issue is whether the district court erred by allowing Camacho to discharge his attorney and proceed pro se without first ordering another competency evaluation. Camacho argues that the court's failure to order another competency evaluation was grounded upon an erroneous interpretation of the Supreme Court's decision in *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). This presents a question of law which we will review de novo. *See Kornberg v. Kornberg*, 542 N.W.2d 379, 384 (Minn.1996) (citation omitted); *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to counsel and, reciprocally, the right of self-representation. *See* U.S. Const.

amend. VI; amend XIV, § 1; *see also* Minn. Const. art. I, §§ 6, 7; *Faretta v. California,* 422 U.S. 806, 807, 818–19, 95 S.Ct. 2525, 2532–33, 45 L.Ed.2d 562 (1975); *Gideon v. Wainwright,* 372 U.S. 335, 343–45, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963). The right of self-representation "embodies such bedrock concepts of individualism and personal autonomy that its deprivation is not amenable to harmless error analysis." *State v. Richards,* 456 N.W.2d 260, 263 (Minn.1990). The denial of either the right to counsel or the right of self-representation does not require a showing of prejudice to obtain reversal. *See Flanagan v. United States,* 465 U.S. 259, 268, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984).

 Under the Fifth and Fourteenth Amendment Due Process Clauses, a criminal defendant may not be tried and convicted unless the defendant is legally competent. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *Godinez,* 509 U.S. at 396, 113 S.Ct. at 2685; *see also* Minn.Stat. § 611.026 (1996); Minn.R.Crim.P. 20.01, subd. 1. The Supreme Court has held that a defendant is competent to stand trial if the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788–89, 4 L.Ed.2d 824 (1970) (per curiam). In Minnesota, a defendant is not competent to stand trial if the defendant:

> (1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or
>
> (2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense.

Minn.R.Crim.P. 20.01, subd. 1.[2]

A defendant's competence also plays a role in the defendant's ability to waive the right to counsel. The Supreme Court has held that a criminal defendant's waiver of the right to counsel must be effectuated "competently and intelligently." *Johnson v. Zerbst,* 304 U.S. 458, 468–69, 58 S.Ct. 1019, 1024–25, 82 L.Ed. 1461 (1938). In *Godinez,* the Court held that the legal standard for competence to waive counsel is the same as the legal standard for competence to stand trial. 509 U.S. at 397–98, 113 S.Ct. at 2685–86, 125 L.Ed.2d 321 (1993).

 A discussion of *Godinez* is warranted. In *Godinez,* the 9th Circuit had held that the Due Process Clause required a hearing on the issue of whether the defendant was competent to make the "reasoned choice" to waive counsel, even though two and one-half months earlier, two psychiatrists had examined him and concluded that he was competent to stand trial. *Id.* at 391–92, 394, 113 S.Ct. at 2682–83, 2683–84. The Supreme Court reversed, and rejected the argument that the decision to waive counsel requires a higher level of mental functioning than the decision to waive other constitutional rights. *Id.* at 399, 113 S.Ct. at 2686–87. *Godinez* established a two-pronged inquiry as a predicate to waiving the right to counsel. First, if a court has reason to doubt the defendant's competence,[3] the court must make "a finding that the defendant is competent to stand trial." *Id.* at 400, 113 S.Ct. at 2687. Second, the court must "satisfy itself that the [defendant's] waiver of his constitutional rights is knowing and voluntary." *Id.*

Prior to *Godinez,* the rule in Minnesota was that the competency standard to exercise the right of self-representation was higher than the competency standard to stand trial. *See State v. Gissendanner,* 343 N.W.2d 668, 669 (Minn.1984); State v. Bauer, 310 Minn. 103, 122–23, 245 N.W.2d 848, 859 (1976). We have not addressed this issue since *Godinez.* In *State v. Thornblad,* the court of appeals held that *Godinez* overruled *Bauer* and *Gissendanner* to the extent that

---

**2.** The Supreme Court recognized in *Godinez* that individual states may impose "more elaborate" standards for competency to stand trial than the *Dusky* standard. *Godinez,* 509 U.S. at 402, 113 S.Ct. at 2688.

**3.** The *Godinez* Court noted that, "[a]s in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez,* 509 U.S. at 401 n. 13, 113 S.Ct. at 2688 n. 13.

those cases held that the competency standard for self-representation was higher than the standard for competency to stand trial. *State v. Thornblad,* 513 N.W.2d 260, 262–63 (Minn.App.1994). In *Thornblad,* the court of appeals reasoned that allowing *Bauer* and *Gissendanner* to stand would place impermissible state restrictions on the federal constitutional right of self-representation. *Id.* at 263.

 It is important to note that Camacho does not question his initial competence to stand trial. Rather, he suggests that a change of circumstances occurred between the initial determinations of competence and the time of his waiver of counsel, which change mandated another competency evaluation. But Camacho does not point to any evidence evincing a subsequent change in his competence to stand trial. The only evidence Camacho presented is evidence that, when framing their reports, Drs. Jorgensen and Malmquist assumed that Camacho would be assisted by counsel during trial. In *Godinez,* the Supreme Court held that "the competence that is required of a defendant seeking to waive his right to counsel is the ·competence to *waive the right,* not the competence to represent himself." *Id.* at 399, 113 S.Ct. at 2687. Justice Blackmun captured the essence of the rule in his dissent when he stated that, according to the majority, "a defendant who is found competent to stand trial with the assistance of counsel is, *ipso facto,* competent to discharge counsel and represent himself." *Id.* at 413, 113 S.Ct. at 2694 (Blackmun, J., dissenting). We are not persuaded by Camacho's argument that Drs. Jorgensen's and Malmquist's competency evaluations were not an accurate measure of his competency to stand trial under the first prong of the *Godinez* inquiry.

 Recognizing that the standards for competency to stand trial and for competency to waive counsel are the same, Camacho requested at oral argument that this court impose a "more elaborate" standard for competency to stand trial than the *Dusky* standard. *See id.* at 402, 80 S.Ct. at 788–89; *supra* note 6. He suggested that an initial competency inquiry include a determination that a defendant would be competent to waive counsel, considering the defendant's individual ability to comprehend and waive this right. We fail, however, to see the utility of such an inquiry in light of *Godinez. Godinez* makes clear that if a defendant is competent to stand trial, the defendant is competent to waive counsel. Our existing standard contained in Minn.R.Crim.P. 20.01, subd. 1 sufficiently measures competency to stand trial. Even if the court does not think it is a "good idea" for a defendant to choose self-representation, it is not the court's role to insert counsel between an unwilling defendant and that defendant's right of self-representation. *See Faretta,* 422 U.S. at 820–21, 95 S.Ct. at 2533–34.

 The district court, upon its own initiative or a motion of either the prosecution or the defense, must suspend criminal proceedings and order a medical examination (or, upon request, hold a competency hearing) if it determines that there is reason to doubt the defendant's competence. Minn. R.Crim.P. 20.01, subd. 2, 3. Evidence of the defendant's irrational behavior, demeanor at trial, and any prior medical opinion on competence to stand trial are relevant in determining whether there is reason to doubt the defendant's competence. *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). In this case, when Camacho made his request to discharge his attorney and proceed pro se, the court reviewed the relevant evidence and observed "nothing whatsoever to question [Camacho's] competency." Accordingly, the court did not order another competency evaluation before finding that Camacho was competent and allowing him to waive counsel. We hold that under the facts and circumstances of this case, the court correctly construed *Godinez* when it did not order another competency evaluation and concluded that Camacho was competent to waive counsel.

### IV.

Having concluded that the district court properly construed the first prong of the *Godinez* inquiry when it did not order another competency evaluation, we now proceed to the second prong of *Godinez.* Under the second prong of the *Godinez* inquiry, the

court must be satisfied that the waiver of counsel is "knowing and voluntary." *Godinez*, 509 U.S. at 400, 113 S.Ct. at 2687; *see also Richards*, 456 N.W.2d at 263 (requiring a clear, unequivocal, and timely request to waive counsel and a knowing and intelligent waiver); Minn.R.Crim.P. 20.01, subd. 1 (requiring a knowing, voluntary, and intelligent waiver). We review the district court's finding that a defendant knowingly, voluntarily, and intelligently waived the right to counsel for clear error. *See Richards*, 456 N.W.2d at 264.

■ Our court has held that, in order to determine whether a waiver of counsel is knowing and intelligent, a court should comprehensively examine the defendant regarding the defendant's comprehension of the charges, the possible punishments, mitigating circumstances, and any other facts relevant to the defendant's understanding of the consequences of the waiver. *State v. Krejci*, 458 N.W.2d 407, 412 (Minn.1990). The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. This court has also recommended that an attorney be appointed to discuss with the defendant the consequences of the waiver if the defendant has not previously consulted with an attorney. *Krejci*, 458 N.W.2d at 412; *Burt v. State*, 256 N.W.2d 633, 635 (Minn. 1977).

■ The record in this case indicates that Camacho's request to proceed pro se was unequivocal and that he was cognizant of the consequences of the decision. Camacho extensively discussed the issue with his attorney, who informed Camacho that he disagreed with Camacho's decision. Camacho acknowledged that "not knowing the court procedures, not knowing the rules and stuff" was a danger associated with representing himself. The district court warned Camacho that if he chose to represent himself, he would be "stuck with it" and would not successfully be able to appeal on the ground that he did not understand what he was doing. Camacho replied, "Yeah, I realize that." At the conclusion of its examination of Camacho,

the court asked, "Do you or do you not wish to have [your attorney] continue to represent you?" and Camacho replied, "No, I don't want him representing me anymore." The court then asked, "And who's going to represent you from this point in time forward," and Camacho replied, "Myself." There is no question that the court conducted a very thoughtful and comprehensive examination of Camacho regarding the facts relevant to his understanding of the consequences of his waiver of the right to counsel.

Camacho points to his IQ of 79 to 82 as evidence that his waiver was not knowing and intelligent. In *Burt v. State*, this court implied that a court's knowledge that the defendant is "of considerably lower than average intelligence" necessitates a more detailed inquiry into the defendant's capacity to intelligently waive counsel. *Burt*, 256 N.W.2d at 636. However, as previously indicated, a detailed inquiry took place in this case, and we have never held that a low IQ by itself precludes a knowing, voluntary, and intelligent waiver of counsel. *See Wold*, 430 N.W.2d at 178; *cf. Connelly*, 479 U.S. at 164, 107 S.Ct. at 520.

■ Camacho also points to his fixation on obtaining a different attorney as evidence that his waiver was not knowing and intelligent. An indigent defendant does not have an absolute constitutional right to the counsel of his or her choice. *Krejci*, 458 N.W.2d at 413 (citation omitted). The fact that a defendant may first request another attorney before choosing self-representation will not by itself undermine the knowing, voluntary, and intelligent nature of the defendant's waiver of counsel. *See Richards*, 456 N.W.2d at 264. This is particularly true if the defendant, as here, is aware that he has no right to a different attorney and must proceed pro se upon rejection of the appointed attorney's assistance. *See State v. Brodie*, 532 N.W.2d 557, 557 (Minn.1995). The district court informed Camacho that under the law he was not entitled to have a second attorney appointed to represent him. Yet, Camacho still insisted upon defending himself rather than retaining his attorney.

We hold that under these facts the district court's finding that Camacho's waiver was knowing, voluntary, and intelligent is not erroneous.

## V.

Having determined that the district court did not err by failing to reevaluate Camacho's competence when he waived counsel and that Camacho's waiver was knowing, voluntary, and intelligent, we must decide whether the district court erred by failing to subsequently order a competency evaluation or to revoke his self-representation during the remainder of the trial.

■ A defendant is denied the right to a fair trial under the Due Process Clause if the district court fails to observe adequate procedures to protect the defendant's right not to be tried or convicted while incompetent. *Drope,* 420 U.S. at 172, 95 S.Ct. at 904; *see* U.S. Const. amend XIV, § 1; Minn. Const. art. I, § 7. In *Bauer,* this court said:

> [T]hroughout the course of criminal proceedings a trial judge must be vigilant in ensuring that the defendant is competent to stand trial and that, when a sufficient doubt of the defendant's competence arises, he must observe procedures adequate to ensure the defendant's competency.

*Bauer,* 310 Minn. at 114, 245 N.W.2d at 854.

■ The procedures that Minnesota courts must observe to ensure a defendant's competence are contained in Minn.R.Crim.P. 20.01. As previously noted, Rule 20.01, subdivision 2 requires a district court, on its own initiative or by motion of the prosecuting attorney or defense counsel, to suspend criminal proceedings and order a competency evaluation if it determines that there is reason to doubt the defendant's competence. Minn.R.Crim.P. 20.01, subd. 2. If the evidence relevant to the defendant's mental condition is undisputed and the court concludes that there is insufficient doubt of the defendant's competence to warrant further inquiry, this court on appeal must review the record to determine whether the district court gave proper weight to the information

suggesting incompetence. *See Bauer,* 310 Minn. at 117, 245 N.W.2d at 856.

■ Camacho argues that even if his initial waiver of counsel was valid, his subsequent conduct during the trial called his competency into question; therefore, the district court on its own initiative should have either reevaluated his competence or revoked his self-representation. As evidence of his subsequent incompetence, Camacho points to his outburst toward a juror; his request to cease representing himself and to have a second attorney act as his counsel; his statement that the jury should begin deliberating after the state rested its case; his becoming emotionally upset at one point in the trial; his insistence on calling the victim's mother as a witness; his ambivalence over whether to testify; and his misunderstanding of the consequences of a mental illness defense.

In *Bauer,* relied upon by Camacho, this court held that the district court should have granted a motion for further psychiatric evaluation of the defendant. *Id.* at 123, 245 N.W.2d at 858. This court based its decision on the judgment of defendant's attorney that the defendant was incapable of participating in or making a legal defense; a psychiatric report rendered approximately one month before trial that the defendant might regress during trial (the defendant had a history of mental illness) and be unable to function adequately; and a medical opinion rendered at the time of the motion that the defendant was paranoidally psychotic and incapable of standing trial. *Id.* at 121–22, 245 N.W.2d at 858. *Bauer* is distinguishable from this case because the evidence cited by Camacho did not give the court reason to doubt his competence. The evidence perhaps suggests lack of proper courtroom decorum and lack of "technical legal knowledge," *see Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541, but not incompetence. The court did not violate Camacho's due process right to a fair trial by failing to order a competency evaluation during the trial based on Camacho's conduct subsequent to his waiver of counsel.

In *Faretta,* the Supreme Court noted that a district court may terminate a defendant's self-representation if the defendant "deliberately engages in serious and obstructionist

misconduct." *Id.* at 834 n. 46, 95 S.Ct. at 2541 n. 46. In *Illinois v. Allen,* the Court affirmed the removal of a pro se defendant from his trial after the defendant argued with the judge in an abusive and disrespectful manner, threatened the judge, and would not cease making abusive remarks after being warned by the judge. 397 U.S. 337, 339–41, 345–46, 90 S.Ct. 1057, 1058–60, 1061–62, 25 L.Ed.2d 353 (1970). Camacho's single outburst during jury selection does not mandate termination of self-representation under the *Faretta* standard.

We conclude that the district court did not err when, after Camacho's waiver of counsel, the court did not subsequently order a re-evaluation of Camacho's competence or revoke his self-representation during the remainder of the trial.

Affirmed.