Dario George BONGA, Appellant,

v.

STATE of Minnesota, Respondent.

No. A10–1376.

Supreme Court of Minnesota.

May 25, 2011.

Melissa Sheridan, Eagan, MN, for appellant.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, and Thomas H. Pertler, Carlton County Attorney, Carlton, MN, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Dario George Bonga pleaded guilty to first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2010), in the stabbing death of Carlos San Miguel. Bonga pleaded guilty at a hearing he requested, and that was held, less than one day after Bonga confessed to killing San Miguel and then tried to kill himself in jail. The district court accepted Bonga's guilty plea, convicted him, and sentenced him to life in prison. Bonga filed a petition for postconviction relief in which he sought to withdraw his guilty plea because he was not competent to plead guilty. In *Bonga v. State (Bonga I )*, 765 N.W.2d 639 (Minn. 2009), we reversed the postconviction court's summary dismissal of Bonga's petition. *Id.* at 643. On remand, the postconviction court denied Bonga's petition after concluding that there was no reason to doubt whether Bonga was competent to plead guilty. The issue in this appeal is whether the district court gave sufficient weight to evidence suggesting incompetence when it concluded that there was no reason to doubt Bonga's competency to plead guilty. We affirm.

We set out the facts of the murder of Carlos San Miguel in *Bonga I*, 765 N.W.2d at 641, and repeat them here only as necessary to this opinion. On July 17, 1998, appellant Dario George Bonga was with San Miguel and two other men when San Miguel made a disparaging remark about a musician Bonga admired. *Id.* Bonga punched San Miguel and stabbed him with a screwdriver. *Id.* San Miguel was stabbed 80 times in the chest, back, and throat. *Id.* Bonga admitted at his guilty plea hearing that some of the stab wounds were intended to kill San Miguel. *Id.* Bonga took money and a wallet from San Miguel's pockets after he died. *Id.* In addition to the facts set out in *Bonga I,* we note here that Bonga testified that after San Miguel fell to the ground, Bonga continued to stab San Miguel in the chest and, after hearing breath from San Miguel, thought San Miguel might still be alive.

Bonga testified that he then continued to stab San Miguel in the chest and throat to make sure San Miguel died.

A grand jury indictment charged Bonga with first-degree premeditated murder, Minn.Stat. § 609.185(a)(1), first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2010), and second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2010). On August 26, 1999, approximately three weeks before trial, the district court heard a motion from Bonga to discharge his public defender and represent himself. At the hearing, Bonga told the court that his public defender thought Bonga had "maybe no kind of defense anyway." Bonga told the court that "my only hope is maybe I can talk to [the prosecutor].... I got something [the public defender] don't have, you know. I can sit down with [the prosecutor] and, you know, tell him what happened that night." The court granted Bonga's motion to represent himself and discharged the public defender. The court appointed the discharged public defender as standby counsel, gave Bonga a week to reconsider, and noted in its memorandum that Bonga "does seem to want to proceed pro se in part to obtain some managerial control over plea negotiations and to have the opportunity for direct discussions" with the State.[1]

Four days later, on August 30, 1999, Bonga asked to meet with a Carlton County investigator and, during the meeting, confessed to killing San Miguel. *Bonga I*, 765 N.W.2d at 641. The transcript of the meeting between Bonga and the investigator indicates that the interview began at 9:33 p.m. and ended at 10:13 p.m. According to medical records filed with the postconviction court, an ambulance was called to the jail at 11:53 p.m., and Bonga was admitted to a local hospital at 12:20 a.m. with self-inflicted razor wounds on his forearms. Bonga was discharged from the hospital at 1:15 a.m., after the wounds were stapled and dressed.

The next morning, Bonga informed the district court that he wanted to plead guilty to first-degree premeditated murder. The court directed standby counsel to meet with Bonga. Standby counsel, Bonga, and counsel for the State appeared in court at 1:10 p.m. Standby counsel informed the court that he had met with Bonga before the hearing and informed Bonga of several options, including that Bonga could have counsel reappointed to represent him and that Bonga could delay the guilty plea hearing. Standby counsel informed the court that Bonga wanted to proceed with the plea hearing.

Standby counsel also informed the court that "[f]rom my discussions with Mr. Bonga today, there have been no difference that I've noticed in [Bonga's] mental or emotional makeup from when I first met him." The court asked standby counsel

---

1. At oral argument before our court, counsel for Bonga waived any appeal of the conclusion that Bonga was competent on August 26, 1999, to waive his right to counsel and represent himself. Accordingly, we do not address the conclusion that Bonga was competent to waive his right to counsel and represent himself. But we note that the transcript of the August 26, 1999, hearing indicates that the district court questioned Bonga about his education, the seriousness of the charges he faced, and whether he understood the risks and requirements of self-representation. The transcript also indicates that Bonga's trial counsel told the district court that counsel did not question Bonga's competency "at all." In its order granting Bonga's motion to represent himself, the district court found that Bonga understood his right to counsel; that Bonga had the mental capacity to understand his right to counsel and to make an intelligent decision to waive it; that Bonga's demand to represent himself was unequivocal and not a product of mental incapacity or undue influence of any other person; and that Bonga's waiver of his right to counsel was clear, unequivocal, timely, and made in a knowing and informed manner.

whether Bonga was "lucid"; standby counsel said that Bonga was lucid, but depressed, and told the court, "I believe Mr. Bonga wants to plead today. He understands the consequences to plead guilty to first degree murder. He wants to proceed and get the plea and be done with this." The court asked standby counsel whether counsel had "made any observations or do you have any reason or basis at all to doubt [Bonga's] competency to either understand the charges or his right to an attorney or his right to trial?" Standby counsel responded:

From my discussions with Mr. Bonga, my understanding of his situation, and also being able to observe him since I was appointed counsel, I would say that at this point in time, Mr. Bonga has an understanding of what is going on, understands the seriousness of the charges, has made an intelligent, knowingly, voluntary decision from his perspective to enter a Plea of Guilty. And as the Court is well aware, he has that right. And I see nothing to prevent Mr. Bonga from going forward today with that request.

The court noted that standby counsel and counsel for the State each had worked on the case for about a year, and, citing Minnesota Rule of Criminal Procedure 20, asked if either was "concerned in regards to [Bonga's] competency." "Is there anything that questions or suggests to either of you that Mr. Bonga is not rational[,] oriented or functioning appropriately at this time? Because the Court would order a competency study if either of you feel that that's at issue, if there's any doubt at all." The transcript includes no response from standby counsel. Counsel for the State responded by asking for and receiving permission to question Bonga, which led to this exchange:

[THE STATE]: Mr. Bonga, why did you try to take your own life last night?

[BONGA]: I—I didn't expect to be here today, you know.

[THE STATE]: I understand that.

[BONGA]: I wasn't. And it wasn't to get attention or nothing like that. It was meant. It was seriously for real, you know, but—

[THE STATE]: You understand, Mr. Bonga, courts can't take guilty pleas from people who aren't in their, to put it in kind of lay terms, from people who aren't in their right minds. Do you understand that? People have to know what they're doing.

[BONGA]: Yeah. Well—

[THE STATE]: And you understand—

[BONGA]: I've been out of right, you know, I ain't been in the right mind for a long time, so this ain't got nothing to do with it.

[THE STATE]: Well, let me ask you this: What is it that you're going to be pleading to today?

[BONGA]: First degree murder.

[THE STATE]: And what's the penalty for being guilty of first degree murder?

[BONGA]: All day long.

[THE STATE]: What does that mean?

[BONGA]: Life.

[THE STATE]: And you've had an opportunity to talk with [the public defender] and you've looked at your options?

[BONGA]: There ain't many there to look at, but yeah.

[THE STATE]: And are you—are you doing this today because you're really guilty, or are you doing this today because you're depressed and want to get it over with?

[BONGA]: A little of both.

The court followed the State's questioning with its own questioning of Bonga.

Bonga told the district court that he had never been a patient at a psychiatric hospital, never treated by a psychiatrist or psychologist, and never prescribed any medicine other than antidepressants. The exchange included the following colloquy:

THE COURT: And I understand that since we talked last, the circumstances have occurred in regards to your suicide.

Sometimes people will attempt suicide because they imagine things or they have some irrational motivation.

Sometimes people commit suicide or attempt to commit suicide because they're emotionally upset and they are depressed, but that doesn't go to competency. That doesn't go to their mental ability.

Now, you made a full statement to the State yesterday, is that correct?

[BONGA]: Yeah.

THE COURT: And had you planned this suicide for some time, or was it just a spur of the moment?

[BONGA]: That was—it was planned for some time. That was the reason that I made that, was just to set the record straight.

THE COURT: Okay. So last week you came over here, one of the reasons you seemed to be telling the Court to discharge [the public defender] is you wanted to be free to talk directly to the Prosecution and talk to the State.

[BONGA]: Yep.

THE COURT: And once—

[BONGA]: Because I knew I was going to do this and that was—that was the reason, you know. . . . I know what, you know, I know what I was facing, you know. I've been there, you know.

THE COURT: You've been imprisoned not just in custody, but actual prison since age of 15 and most of your life, is that right? [2]

[BONGA]: Yeah.

THE COURT: So you know what prison is like.

[BONGA]: Yeah.

THE COURT: So once you accomplished having [the public defender] discharged so that you could talk directly with the State, you did make a statement voluntarily to [the investigator] yesterday, is that right?

[BONGA]: Yep.

THE COURT: A full detailed statement?

[BONGA]: Yep.

THE COURT: And that was in an attempt to set the record straight?

[BONGA]: Yep.

THE COURT: In other words—

[BONGA]: I wasn't expecting to be here today.

THE COURT: But you wanted to tell him the truth . . . before you killed yourself?

[BONGA]: Exactly.

THE COURT: So indeed this suicide plan of yours was a thought out part of a procedure you had?

[BONGA]: Yes. I couldn't even do that right.

THE COURT: Well, I would have to say that obviously, Mr. Bonga is depressed and he—and I don't know if he is emotionally upset at this time, other than his failure to succeed. But I don't think being emotionally upset goes to legal competency. He seems to be oriented.

The district court asked Bonga if he understood that by pleading guilty to first-degree murder, he was giving up the

---

**2.** Bonga was 36 years old at the August 31, 1999, hearing.

chance to have a jury consider the lesser count of second-degree intentional murder. Bonga asked about the difference between the charges twice: he first asked about the possible sentence for second-degree intentional murder; later, he told the court that he wanted to know more about the lesser charge. The court granted a recess for Bonga to discuss the charges with standby counsel and counsel for the State. After the recess, standby counsel told the court that he had explained to Bonga "premeditation and intentional murder and the differences between first and second degree murder, differences in the counts of the indictment." Bonga chose to go forward with the guilty plea after that conversation.

Before it accepted Bonga's plea, the court asked Bonga whether, "after everything that I've said to you now this afternoon, and in view of all these factors and considerations," Bonga wanted to waive his right to trial and plead to the indictment. Bonga said yes. The court then informed Bonga that "you have the right to change your mind. And I told you that I'd give you a continuance.... Are you still unequivocal that you want to do this?" Bonga said yes. The court found Bonga's decision to plead guilty to be knowing, intelligent, and voluntary, accepted Bonga's waiver of his right to trial by jury, accepted Bonga's guilty plea, adjudicated Bonga guilty of the intentional and premeditated murder of San Miguel, and later sentenced Bonga to life in prison.

Bonga did not file a direct appeal. *See Bonga I*, 765 N.W.2d at 642. In 2001 Bonga filed a pro se motion asking the district court to vacate, set aside, or correct his sentence pursuant to Minn. R.Crim. P. 27.03, subd. 9 (2009) (amended Jan. 1, 2010). 765 N.W.2d at 642. The court denied Bonga's motion without a hearing after apparently treating the motion as a petition for postconviction relief.

*Id.* Bonga did not appeal. *Id.* The current proceeding began in 2007, when Bonga, represented by counsel, filed a petition for postconviction relief seeking to withdraw his guilty plea because he was not competent to waive counsel or to plead guilty. *See id.* The postconviction court dismissed the petition without a hearing after characterizing it as a successive petition for postconviction relief. *Id.* We reversed because when the district court decided to treat the 2001 motion as a petition for postconviction relief, "the court was required to, but did not, recognize that Bonga had the right to be represented by counsel." *Id.* at 643 (citing Minn.Stat. § 590.05 (2010)).

On remand to the postconviction court, the postconviction court, which was also the district court that accepted the waiver of counsel and the guilty plea, determined that there was no reason to doubt Bonga's competency at the August 26, 1999, hearing at which Bonga waived his right to counsel, and that there was no reason to doubt Bonga's competency when he pleaded guilty on August 31, 1999. The postconviction court stated that neither Bonga's suicide attempt nor the medicine Bonga was taking for depression rendered him incompetent. The postconviction court instead relied upon Bonga's interactions with standby counsel and counsel for the State, the opinions of both lawyers, and its own "extensive[ ]" observation of Bonga before and during the plea hearing in concluding that Bonga's "demeanor and behavior were normal for someone in his situation, he understood and participated in the proceedings and this Court had no reason to doubt his competency."

 Bonga, on appeal, asserts that the district court should not have accepted his guilty plea because the suicide attempt was a sufficient reason to doubt Bonga's competency to proceed. Bonga contends

that the court should have suspended the proceedings and ordered an examination of and report on Bonga's mental condition, as provided in Minn. R.Crim. P. 20.01 (2009) (amended Jan. 1, 2010).[3] Bonga argues that the postconviction court abused its discretion when it denied relief. We review the postconviction court's legal determinations de novo. *State v. Finnegan*, 784 N.W.2d 243, 247 (Minn.2010). We will reverse the court's factual findings only if they are clearly erroneous. *Id.*

## I.

A defendant has a due process right not to be tried or convicted of a criminal charge if he or she is legally incompetent. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Camacho*, 561 N.W.2d 160, 171 (Minn.1997); *State v. Bauer*, 310 Minn. 103, 114, 245 N.W.2d 848, 854–55 (1976). The Supreme Court has held that a defendant is competent to stand trial in a criminal matter if he or she "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (internal quotation marks omitted), *cited in Camacho*, 561 N.W.2d at 171. A district court's failure "to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope*, 420 U.S. at 172, 95 S.Ct. 896; *see Pate*, 383 U.S. at 385, 86 S.Ct. 836; *Bauer*, 310 Minn. at 108, 114 n. 7, 245 N.W.2d at 852, 855 n. 7. Whether a court observed procedures adequate to

protect a defendant's right not to be tried or convicted while incompetent is a different question than whether the defendant is incompetent. *Bauer*, 310 Minn. at 108, 245 N.W.2d at 852. "The issue is a narrow one. It is not whether the defendant was competent to stand trial ... but only whether the trial court, in fulfilling its protective duty, should have conducted further inquiry...." *Id.* at 108, 245 N.W.2d at 852.

Minnesota Rule of Criminal Procedure 20.01 provides the standard for competency in a criminal proceeding and the procedures that state courts must observe to ensure a defendant's competence. A defendant is not competent to enter a plea, stand trial, or be sentenced if he or she "(1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or (2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense." Minn. R.Crim. P. 20.01, subd. 1. The prosecutor, defense attorney, and the court share the duty to protect the right of a defendant not to be tried or convicted while incompetent. Minn. R.Crim. P. 20.01, subd. 2. "If during the pending proceedings, the prosecuting attorney, defense counsel or the court has reason to doubt the competency of the defendant, then the prosecuting attorney or defense counsel by motion or the court on its initiative shall raise that issue." *Id.* The rule then provides:

> If the court in which a criminal case is pending determines upon motion of the prosecuting attorney or defense counsel or upon initiative of the court that there is reason to doubt the defendant's competency as defined by this rule, the court shall suspend the criminal pro-

---

**3.** In this opinion, we use the version of our Rules of Criminal Procedure that was in effect prior to the stylistic amendments effective on January 1, 2010.

ceedings and shall proceed as follows:
...

(3) *Medical Examination.* The court shall appoint at least one examiner ... to examine the defendant and to report to the court on the defendant's mental condition.

*Id.* The rule provides for a hearing at which the court may accept the evaluation report and other evidence as to the defendant's mental condition before the court determines whether the defendant is competent to proceed. *Id.,* subd. 3. If the court determines a defendant is competent to proceed, then the criminal proceedings resume. *Id.,* subd. 4.

In *Drope,* the Supreme Court noted the difficulty in determining whether a defendant's mental condition renders him or her incompetent. 420 U.S. at 179, 95 S.Ct. 896. The Supreme Court stated that

> evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but ... even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope,* 420 U.S. at 180, 95 S.Ct. 896, *cited in part in Bauer,* 310 Minn. at 116, 245 N.W.2d at 855. At issue in *Drope* was how the trial court should have evaluated the defendant's attempt to commit suicide while his trial was under way. *Id.* at 180–82, 95 S.Ct. 896. The Supreme Court stated that the defendant's suicide attempt "did not stand alone," considered it along with other evidence, and concluded that the aggregate of the evidence created a sufficient doubt of the defendant's compe-

tence. *Id.* at 180, 95 S.Ct. 896 (citation omitted) (internal quotation marks omitted).

■ The Supreme Court stated that Drope's suicide attempt weighed in favor of finding a reason to doubt his competence, in part because it was "an act which suggests a rather substantial degree of mental instability contemporaneous with the trial" that caused Drope to be absent "for a crucial portion of his trial." *Id.* at 180–81, 95 S.Ct. 896. Because Drope was absent, "the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him." *Id.* The Court noted: "Of course we also recognize that the empirical relationship between mental illness and suicide or suicide attempts is uncertain and that a suicide attempt need not always signal an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion." *Id.* at 181 n. 16, 95 S.Ct. 896 (citation omitted) (internal quotation marks omitted). As we noted in *Bauer,* the Court in *Drope* "purposefully avoided" setting a standard for the "nature or quantum of evidence" that would establish a reason to doubt a defendant's competency to proceed. *Bauer,* 310 Minn. at 116, 245 N.W.2d at 855 (quoting *Drope,* 420 U.S. at 172, 95 S.Ct. 896). Rather, as we observed in *Bauer* and *Camacho,* the Court identified some factors relevant to whether further inquiry into competence is required: a defendant's "irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope,* 420 U.S. at 180, 95 S.Ct. 896, *cited in Bauer,* 310 Minn. at 116, 245 N.W.2d at 855, *and Camacho,* 561 N.W.2d at 172.

If the evidence possibly relevant to a defendant's mental condition is not disputed, then we review the record to determine whether the district court gave "proper weight to the information suggesting incompetence" when it came to its conclusion that there was not sufficient doubt of the defendant's competency so as to require further inquiry. *Camacho*, 561 N.W.2d at 174; *Bauer*, 310 Minn. at 117, 245 N.W.2d at 856 (citing *Drope*, 420 U.S. at 174–75, 95 S.Ct. 896); *see also Drope*, 420 U.S. at 179, 95 S.Ct. 896; *State v. Ganpat*, 732 N.W.2d 232, 238 (Minn.2007); *Shoen v. State*, 648 N.W.2d 228, 231 (Minn. 2002). "A decision on the need for further inquiry depends entirely on the surrounding circumstances...." *Bonga I*, 765 N.W.2d at 644 (Meyer, J., concurring). The parties in this case do not dispute the evidence that is relevant to Bonga's mental condition: his suicide attempt and his demeanor and behavior during the guilty plea hearing. For the reasons that follow, we conclude that the district court gave proper weight to Bonga's suicide attempt when it concluded Bonga's competency was not in sufficient doubt to require further inquiry.

As in *Drope*, Bonga's suicide attempt was evidence of irrational behavior—"an act which suggests a rather substantial degree of mental instability" contemporaneous with his guilty plea hearing. *See* 420 U.S. at 181, 95 S.Ct. 896. Unlike *Drope*, however, the district court, prosecutor, and standby counsel in this case observed Bonga in the context of the criminal proceeding after his suicide attempt. As a result, counsel and the court could gauge from Bonga's demeanor whether he was able to consult with a reasonable degree of rational understanding with standby counsel and whether he was capable of understanding the proceedings or participating in his defense.

Bonga demonstrated that he was able to consult with a reasonable degree of rational understanding with standby counsel by consulting with standby counsel before and during the guilty plea hearing. Standby counsel informed the district court of his interactions with Bonga, the options he presented to Bonga, and Bonga's election to proceed with the hearing. Bonga demonstrated that he was capable of understanding the proceedings and participating in his defense when he informed the court before pleading guilty that he understood the penalty he faced if he pleaded guilty to first-degree murder, and when he told the court that he wanted to know more about the second-degree murder charge contained in the indictment. The court granted a recess, during which Bonga discussed intent, premeditation, and the difference between first- and second-degree murder with his standby counsel and counsel for the State. After the recess, Bonga again indicated he wanted to plead guilty to first-degree premeditated murder.

*Drope, Bauer,* and *Camacho* establish that, in addition to evidence of irrational behavior, any prior medical opinion on competence and the defendant's demeanor also are relevant when a court determines whether there is a reason to doubt a defendant's competence. Those factors are either not present in this case or weigh in favor of Bonga's competence. First, Bonga informed the district court he had never been hospitalized or treated for a psychiatric condition. Second, the postconviction court relied on its own "extensive[ ]" observations of Bonga before and during the guilty plea hearing when it concluded Bonga's demeanor and behavior were "normal for someone in his situation."

Finally, we note that the district court elicited most, if not all, of the evidence relevant to Bonga's competence during the guilty plea hearing. Bonga engaged in a

colloquy with the district court in which he told the court that his decisions to represent himself, to confess to killing San Miguel, and to attempt suicide were part of a plan intended to "set the record straight" about the murder. The court questioned standby counsel about his interactions with Bonga, and standby counsel informed the court that Bonga understood the proceedings and the seriousness of the charges. The court informed standby counsel and counsel for the State that it would order a competency evaluation "if there's any doubt at all" about Bonga's competency, and proceeded with the hearing after neither counsel raised any doubt. After its colloquy with Bonga, the court concluded that, while Bonga appeared depressed and possibly upset, "I don't think being emotionally upset goes to legal competency. He seems to be oriented." We conclude that, under all the circumstances of this case, the district court gave sufficient weight to evidence suggesting incompetence when it concluded there was no reason to doubt Bonga's competency as defined by Minn. R.Crim. P. 20.01, subd. 1.[4] We affirm the postconviction court.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. I believe the fact that Bonga made an irrational decision to take his own life combined with the other circumstances of the case gave the trial court reason to doubt whether Bonga was competent when he fired his attorney, confessed to the killing, and then pleaded guilty to the highest charge without seeking any concessions from the State.

As I discussed in my concurrence in *Bonga v. State* (*Bonga I* ), 765 N.W.2d 639

(Minn.2009), the district court has a legal duty to ensure that a defendant is competent to stand trial. *Id.* at 643 (Meyer, J., concurring) (citing *State v. Bauer,* 310 Minn. 103, 114, 245 N.W.2d 848, 854–55 (1976)); *see also* Minn. R.Crim. P. 20.01, subd. 1. A defendant is incompetent and cannot plead guilty if the defendant "(1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or (2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense." Minn. R.Crim. P. 20.01, subd. 1 (2009) (amended Jan. 1, 2010).

If a district court has reason to doubt a defendant's competency, the court is required to suspend the criminal proceedings and appoint an examiner to examine and report back to the court on the defendant's mental condition. Minn. R.Crim. P. 20.01, subd. 2. Reason to doubt is not a high standard. In determining whether doubt exists as to a defendant's competency, a court must base its decision on the surrounding circumstances of the case, including the defendant's irrational behavior, his demeanor during court proceedings, and prior medical opinions on competency. *State v. Camacho,* 561 N.W.2d 160, 172 (Minn.1997) (citing *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)). However, due to the "wide range of manifestations and subtle nuances" that would indicate incompetence, the court must look to more than just the defendant's behavior during court proceedings when the defendant has a history of irrational behavior. *Drope,* 420 U.S. at 180, 95 S.Ct. 896.

---

4. Because we conclude that the district court properly determined that there was no reason to doubt Bonga's competency as defined by Minn. R.Crim. P. 20.01, subd. 1, we do not address any assertion by Bonga that the pro-

tective duty that follows a district court's determination that there is a reason to doubt a defendant's competency includes the duty to reappoint counsel, if the defendant is proceeding pro se.

Here, the record plainly demonstrated that Bonga's self-destructive spiral into depression should have given the court reason to doubt his ability to make a rational choice and his mental competence. Bonga's medical records indicate that, for two months prior to his suicide attempt, he suffered from stress, sleeplessness, and "extreme depression," for which he was prescribed daily doses of the antidepressant Trazodone. Bonga's depression led him to despair, resulting in him discharging his counsel because he knew "what's going to happen in the end anyway"—he was going to "crash and burn" with or without an attorney. Further, his despair had apparently built up and finally drove him to take his own life—he made a full confession to the police about the murder and then promptly returned to his cell to commit suicide. Fortunately, the guards discovered him before he died and Bonga was taken to a hospital, where he was treated and released.

Less than twelve hours after he attempted suicide, Bonga appeared in court to plead guilty to first-degree murder. The record indicates he had not been given any anti-depressants that day. He had not slept much and had survived a serious attempt to end his life. During questioning about his competency to plead guilty, Bonga admitted to the court that he "ain't been in the right mind for a long time" and that he "didn't expect to be here [alive] today." Bonga stated on two separate occasions that he had not intended to kill San Miguel, contradicting his desire to plead guilty to intentional murder. When he was asked if he was confessing because he was "really guilty" or because he was depressed and wanted "to get it over with," Bonga stated it was "[a] little of both." These statements prompted the court to determine that Bonga was "[o]bviously ... depressed." I believe these statements also were a signal to the court that Bonga's plea was irrationally made for the purpose of getting the whole thing "over with." The circumstances indicate that Bonga likely would have pleaded guilty to any charge to have an end to the proceedings.

In fact, Bonga's depression and desire to "get it over with" could have inspired his desire to plead guilty to premeditated first-degree murder when he stated that the killing had not been intentional—a person who rationally cared about his fate would likely have taken more interest in, and more than 14 minutes to discuss with standby counsel, the lesser-included offenses of second-degree murder and manslaughter. If Bonga did not intend to kill San Miguel, as he stated to the court a few times, then he should have pursued, as any rational person would, a plea bargain for a lesser-included offense with a less harsh sentence.

Bonga's mental illness, his disregard for his life, the stress and lack of sleep prior to the guilty plea, and his statements at the plea hearing could be a manifestation of an irrational state of mind. As such, I believe the court had reason to doubt Bonga's competency and ability to protect his own interests, and should have ordered an examination pursuant to Minn. R.Crim. P. 20.01, subd. 3. Consequently, I would grant Bonga's motion to withdraw his guilty plea and order the case remanded for trial.