*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0469**

Desiree Nicole Shinholser, petitioner,
Appellant,

vs.

State of Minnesota,
Respondent.

**Filed December 21, 2015
Affirmed
Halbrooks, Judge**

Roseau County District Court
File No. 68-CR-12-946

Cathryn Middlebrook, Chief Appellate Public Defender, Veronica M. Surges, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, Robert Plesha, Assistant Attorney General, St. Paul, Minnesota; and

Karen Foss, Roseau County Attorney, Roseau, Minnesota (for respondent)

Considered and decided by Peterson, Presiding Judge; Halbrooks, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HALBROOKS**, Judge

Appellant challenges the district court's denial of her postconviction petition to withdraw her guilty plea, arguing that her guilty plea was unintelligent because she was

under extreme mental and physical distress at the time of the plea hearing.  Because we find that the district court acted within its discretion by denying appellant's petition, we affirm.

**FACTS**

On October 5, 2012, J.A. called the Roseau County Sheriff's Department complaining that her boyfriend, J.C., was missing.  When J.C. had not made contact with her by October 6, 2012, J.A. stopped by his apartment to see if he was home.  She went inside and subsequently discovered J.C.'s body when she looked out of a bedroom window into a separate, enclosed area of the apartment building.

Officers responded and found J.C.'s deceased body in a near fetal position, bound with a belt or similar object.  The crime-scene investigators found numerous contusions on his body, including bruising and abrasions on his legs.  There were also blunt-force injuries and chopping wounds to his head.  Medical examiners later concluded that J.C.'s death was a homicide by asphyxia due to manual strangulation.

Investigators canvassed the area and spoke with Jeremy Lemen, who said that he had gotten into an argument with J.C. two days earlier when J.C. was intoxicated.  Lemen and his girlfriend, appellant Desiree Nicole Shinholser, lived in the same apartment complex as J.C.  Lemen first told officers that he helped J.C. get into his apartment late on the night of October 4, 2012, and that J.C. had tried "taking a swing at him."  Officers noted a black eye and bruising on Lemen's face.

Officers advised Lemen of his *Miranda* rights, and he stated that he understood his rights and agreed to speak with investigators.  Lemen then described his altercation with

2

J.C. in greater detail. This description included the statement that J.C. had hit Lemen with a barbeque grill, which caused the injuries to Lemen's face. Officers asked Lemen for permission to enter his apartment and subsequently found Shinholser barricaded inside. After the officers were inside, Shinholser stated that J.C. had been in their home seeking assistance from the couple because he was locked out of his apartment. Lemen assisted him and came home with cuts on his face.

Shinholser told officers that she was pregnant and that J.C. had assaulted her earlier in the week by throwing her to the ground. When questioned about this incident, Lemen told the officers that he did not feel it was appropriate to assault a pregnant woman. Lemen then acknowledged that he and Shinholser had gone back to J.C.'s apartment after helping him earlier that evening. Lemen stated that after J.C. threw the barbeque grill at him, he put J.C. in a choke hold, describing the choke as "using his arms until his arms were too tired." He stated that Shinholser was with him and that while Lemen was choking J.C., Shinholser "may have struck [J.C.] on the head a few times with a hatchet or similar type object." Lemen also admitted to using belts to restrain J.C. during the assault. Lemen revealed that he and Shinholser had discussed this type of attack before it happened because of J.C.'s alleged earlier assault on Shinholser.

Investigators found Facebook postings from Shinholser's account in which she complained about J.C.'s assault and accused Lemen of being a coward for not defending her. Lemen stated that after killing J.C., he and Shinholser disrobed and burned their clothing in the fire pit outside. He also said that Shinholser prepared a bath for him so that he could wash after the assault.

3

Shinholser was charged with second-degree murder. She pleaded guilty to aiding and abetting second-degree unintentional murder in violation of Minn. Stat. § 609.19, subd. 2(1) (2012), and was sentenced to 216 months in prison, a term at the upper end of the sentencing-guidelines range. The district court supported the sentence by noting several aggravating factors concerning the nature of the crime—a home invasion that violated J.C.'s zone of privacy while he slept, a crime with no other purpose than to terrorize and beat J.C., and purposeful concealment of J.C.'s body.

On October 16, 2014, Shinholser petitioned for postconviction relief without requesting an evidentiary hearing, seeking to withdraw her guilty plea on the basis of extreme mental and physical distress at the time of the plea hearing. The district court denied Shinholser's petition. This appeal follows.

**D E C I S I O N**

"When reviewing a postconviction court's decision, we examine only whether the postconviction court's findings are supported by sufficient evidence. We will reverse a decision of [the] postconviction court only if that court abused its discretion." *Lussier v. State*, 821 N.W.2d 581, 588 (Minn. 2012) (alteration in original) (quotations omitted). "A defendant bears the burden of showing [her] plea was invalid." *State v. Raleigh*, 778 N.W.2d 90, 94 (Minn. 2010). A defendant does not have an absolute right to withdraw a valid guilty plea, but a court must allow a defendant to withdraw a guilty plea after sentencing if "withdrawal is necessary to correct a manifest injustice." Minn. R. Crim. P. 15.05, subd. 1. Manifest injustice occurs if the guilty plea was not accurate, voluntary, and intelligent. *Perkins v. State*, 559 N.W.2d 678, 688 (Minn. 1997). "The intelligence

4

requirement ensures that a defendant understands the charges against [her], the rights [she] is waiving, and the consequences of [her] plea." *Raleigh*, 778 N.W.2d at 96.

Shinholser asserts a single issue in this appeal—that her guilty plea was not intelligent. She maintains that she was under such extreme mental and physical distress at the time of her plea that it prevented her from understanding the nature and consequences of pleading guilty. Based on our review of the record, Shinholser's claim is without merit.

Shinholser demonstrated at her plea hearing that she comprehended the nature of her plea and that the consequences of such a plea would lead to incarceration. Shinholser indicated that she understood that her guilty plea meant that she would spend a minimum of 200 months in prison. When asked whether she was taking any medications for a nervous or psychiatric condition, Shinholser indicated only that she took Adderall and Prozac. She admitted that those medications did not impair her ability to understand what occurred at the hearing. Shinholser also denied being under the influence of any drugs or alcohol or suffering from mental illness on the date of the offense. She was able to recount the events of the crime without difficulty. We conclude that the record demonstrates that Shinholser had a firm understanding of the terms and conditions of her guilty plea as well as the rights she was giving up by foregoing trial.

Shinholser now contends that she pleaded guilty in order to get out of jail and into prison, where she felt she would have a better opportunity to commit suicide. To support her suicidal ideations, Shinholser points to an earlier incident when she claimed that she swallowed a razor blade while in jail. Jail officials responded to her call and transported her to LifeCare Medical Center. She told medical staff that she swallowed the razor blade

in response to being "jumped." X-rays failed to detect any evidence of a swallowed razor blade. Further, medical records not only refuted the presence of a razor blade but contradicted Shinholser's claim of a suicide attempt.

Shinholser also claims that she was under mental distress due to a miscarriage. But there is no proof that she was pregnant. She refused to take a pregnancy test at the jail and again at the clinic. The clinic staff noted that she has a strong history of manipulative behavior.

The record is replete with the kind of contradictory statements and accounts of behavior that indicate that Shinholser has long attempted to manipulate the legal system. One example is contained in a letter that Shinholser wrote while in jail, four days before her plea hearing. In this letter, she openly discussed her tactics:

> I'd rather be in a looney bin than in jail. . . . I did the same thing [with] some friends in Juvi, the hospital in Duluth was a lot more fun than chopping wood all day – (more drugs) – us crazy juvenile delinquents, haha.
>
> . . . .
>
> . . . I know I'm not crazy, but I'd do anything to get out of jail (free). Almost anything I should say, if it's as easy as saying I'm suicidal, I don't see it as a bad idea.

Shinholser began serving her sentence at MCF-Shakopee but was transferred to a more secure facility after accruing numerous rule violations that led her to spend a significant percentage of her time in segregation. The prison psychologist offered her a fresh start if she chose compliance, but she opted for non-compliance. In prison, Shinholser

was characterized as having an "impulsive and defiant nature," and prison officials were concerned that she might walk out of MCF-Shakopee or harm prison officials.

Evidence of a defendant's irrational behavior, demeanor during trial or at hearings, and prior medical opinions on competence are all relevant factors for determining one's ability to comprehend the plea process. *Bonga v. State*, 797 N.W.2d 712, 719 (Minn. 2011). Here, Shinholser's claims are contradicted by her plea petition, plea-hearing testimony, and medical and prison records during her time awaiting trial. Even if she has a history of mental-health issues, mental-health illness alone is not the test for whether a defendant is competent to stand trial or enter a valid guilty plea. Rather, "[a] defendant is incompetent and must not plead, be tried, or be sentenced if the defendant lacks ability to: (a) rationally consult with counsel; or (b) understand the proceedings or participate in the defense due to mental illness or deficiency." Minn. R. Crim. P. 20.01, subd. 2. The record reflects that Shinholser was able to do both.

The district court denied Shinholser's petition for postconviction relief in part because her claims are articulated in a self-serving affidavit written in support of her petition. Because Shinholser relied solely on her affidavit, she offers no factual support for her claim that her guilty plea was not intelligently made. There was no conduct during the plea hearing to indicate that she might not be competent to plead guilty. In fact, she underwent thorough questioning on the record concerning her ability to understand the proceedings, and she indicated at all times that she fully understood the nature and consequences of her guilty plea. There is a complete lack of support in the record to suggest that Shinholser's decision to plead guilty was the result of mental or physical distress that

7

rendered her guilty plea unintelligent. Because the district court acted within its discretion by denying Shinholser's petition for postconviction relief, we affirm.

**Affirmed.**