*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0914**


State of Minnesota,
Respondent,

vs.

James William Kralik,
Appellant.


**Filed April 25, 2016
Affirmed in part and remanded
Halbrooks, Judge**


Scott County District Court
File No. 70-CR-14-4214

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Ronald Hocevar, Scott County Attorney, Todd P. Zettler, Assistant County Attorney, Shakopee, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Bjorkman, Presiding Judge; Halbrooks, Judge; and

Smith, John, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HALBROOKS**, Judge

Appellant challenges his convictions of first-degree aggravated robbery, first-degree burglary, and second-degree assault, arguing that he was denied due process of law when the district court declined to order a Minn. R. Crim. P. 20.01 competency examination after he tested positive for methamphetamine and THC during the trial. Because we conclude that, on this record, the district court did not err by declining to order a rule 20.01 competency examination, we affirm the conviction. But because the district court erroneously imposed a no-contact order as part of appellant's executed sentence, we remand to the district court to vacate the no-contact order.

## FACTS

On March 11, 2014, police officers responded to a report of an alleged assault. J.T.B. and his girlfriend were at home when a group of men barged in unannounced and began beating J.T.B. and demanding money. Appellant James William Kralik was later identified as one of the men who had participated in the attack on J.T.B. According to Kralik's roommate, Kralik and J.T.B. had combined their money in order to purchase drugs. J.T.B. was entrusted with delivering approximately $1,100 to the supplier. J.T.B. testified that the supplier left with the money but never returned with the drugs. According to J.T.B., Kralik held him responsible for losing the money. In the course of the attack, Kralik brandished a knife and used a tire iron to hit J.T.B. on his legs, chest, and face. Both J.T.B. and his girlfriend identified Kralik from a photo line-up as one of the men who participated in the attack. And Kralik was subsequently arrested.

Kralik was charged with first-degree aggravated robbery and first-degree burglary. After he posted bail and was released pending trial, he failed to appear for court on two separate instances—for an omnibus hearing and the first day of trial. When Kralik failed to appear for trial, Kralik's counsel contacted him, and Kralik advised his attorney that he was ill and would provide a doctor's note. The trial started the following day, which was a Friday. The district court advised Kralik that it would limit trial on Friday to jury selection in order to give him an opportunity to recuperate over the weekend. Before jury selection started, the state amended the complaint to add a third count—second-degree assault with a deadly weapon. The district court then confirmed with Kralik his decision not to accept the state's 39-month plea offer. Kralik reiterated that he was declining the state's offer and advised the district court that he did not need additional time to consult with his attorney. Following completion of jury selection, the jury was dismissed for the weekend.

On Monday, the district court observed that Kralik fell asleep during the victim's cross-examination. On Tuesday, Kralik fell asleep again. In response, the prosecutor asked the district court to order a urine test to detect whether Kralik was under the influence of any controlled substances. Kralik's attorney did not raise competency concerns but agreed that a drug test was a good idea for "possible appeal ramifications," noting that a positive drug test might be grounds for a mistrial if Kralik was incapable of assisting counsel.

Kralik tested positive for methamphetamine and THC. Upon learning the results, the district court engaged Kralik in a lengthy discussion on the record in order to assess

3

his capacity to continue but did not order a formal rule 20.01 competency evaluation. The district court determined that Kralik seemed fully functional, and the trial continued. Kralik waived his right to testify and asked the district court to instruct the jury on his right to do so. Following deliberation, the jury found him guilty on all three counts.

At sentencing, Kralik sought a durational departure, asking the district court to sentence him to the state's original offer of 39 months. Kralik claimed that he had been incapacitated and unable to participate in the proceedings or to assist in his defense. The district court denied Kralik's motion, sentenced him to 93 months for first-degree robbery, and ordered him to have no contact with J.T.B. This appeal follows.

## D E C I S I O N

## I.

Kralik argues that he was denied due process of law when the district court failed to order a competency exam after (1) the district court knew of his long-term drug addiction, (2) he failed to appear on his scheduled trial date, (3) and he fell asleep twice during his trial. "A defendant has a due process right not to be tried or convicted of a criminal charge if he or she is legally incompetent." *Bonga v. State*, 797 N.W.2d 712, 718 (Minn. 2011). The test for determining whether a defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 789 (1960) (per curiam); *see also* Minn. R. Crim. P. 20.01, subd. 2 ("A defendant is incompetent and must not plead, be tried, or be sentenced if the

4

defendant lacks ability to: (a) rationally consult with counsel; or (b) understand the proceedings or participate in the defense due to mental illness or deficiency."). "The prosecutor, defense attorney, and the court share the duty to protect the right of a defendant not to be tried or convicted while incompetent." *Bonga*, 797 N.W.2d at 718 (citing Minn. R. Crim. P. 20.01, subd. 2).

Kralik contends that the district court erred when it declined to order a rule 20.01 competency exam after his drug test confirmed that he had methamphetamine and THC in his system. Thus, the proper inquiry is not just whether Kralik was competent; it is whether the district court followed the correct procedure after a question of competency arose. The question is "whether the [district] court, in fulfilling its protective duty, should have conducted further inquiry." *Id.* (quotation omitted). "A decision on the need for further inquiry depends entirely on the surrounding circumstances. . . ." *Id.* at 720 (quotation omitted).

If evidence concerning a defendant's mental capacity is undisputed, "we review the record to determine whether the district court gave proper weight to the information suggesting incompetence when it came to its conclusion that there was not sufficient doubt of the defendant's competency so as to require further inquiry." *Id.* (quotation omitted). This court must determine whether "the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into [the defendant's] competence to stand trial, denied him a fair trial." *Drope v. Missouri*, 420 U.S. 162, 174-75, 95 S. Ct. 896, 905 (1975).

Because the parties do not dispute the evidence relevant to Kralik's competency—his history as an addict, his failure to show up on the first day of his trial, and the fact that he fell asleep during portions of the trial—this court determines whether the record supports the district court's conclusion that a rule 20.01 competency evaluation was unnecessary following a positive result on the court-ordered drug test. Several facts in the record support a conclusion that Kralik was able to rationally consult with counsel and understand the proceedings.

First, when the results of the urine test were disclosed, the district court stated:

> Each and every time that I've spoken to Mr. Kralik on Friday, again yesterday (Monday), he has appeared to me to be fully functional. He appears to me to be responsive. I asked him a number of questions yesterday in regard to his Fifth Amendment rights. He looked me in the eye when I spoke to him. He gave appropriate responses and answers.

The district court also engaged Kralik in a lengthy colloquy about the results:

> THE COURT: Earlier, before I had you tested for drugs or anything in your system, I made some observations of you. And you agreed with my observations. Do you remember that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay. I know that on Friday we picked our jury. And I know that you participated in that because I watched you do it. Would you agree with that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay. As you stand here today, do you believe that you are under the influence of any chemicals as you stand here today?
>
> THE DEFENDANT: That inhibits me in any way, no.

6

THE COURT: Okay. You know you're standing trial?

THE DEFENDANT: Yes, sir.

THE COURT: You've watched, because I've watched you. You've watched the jury? Yes?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Do you feel like, as you stand here today, that you've been able to participate with your lawyer?

THE DEFENDANT: Yes, I do.

. . . .

THE COURT: Okay. And so as you stand here today, do you believe that you're clear headed and that you understand the proceedings?

THE DEFENDANT: Yes, sir.

The district court noted that Kralik appeared to be fully functioning because he did not have glassy eyes, appear to be agitated, or have involuntary movements.

Second, with regard to Kralik's Fifth Amendment rights, nothing in the record indicates that he was unaware of his rights or was acting irrationally. When the district court advised Kralik of possible implications of his decision not to testify, Kralik responded, "I understand. I understand everything." The district court appropriately and thoroughly advised Kralik of his Fifth Amendment rights:

THE COURT: All right. Mr. Kralik, . . . [y]ou have an absolute right to testify in this trial. If you choose to testify, nobody can keep you off the witness stand. I can't. Mr.

7

Swanson can't. Your family can't. Nobody can keep you off the stand. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You also have a Fifth Amendment right against self-incrimination. . . . Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Even if I said you need to testify, or your lawyer told you to testify, you don't have to. And you'd never hear me tell you to testify.

THE DEFENDANT: Yes, sir.

THE COURT: You can discuss with Mr. Swanson what he thinks statistically is a good idea, but in the end, this is your case. This is your trial. This is your life. You get to decide.

Third, Kralik maintains that the district court should have considered his failure to appear on the first day of trial as an indication that he lacked the capacity to continue. But the district court judge spoke on the phone with Kralik that day, and Kralik explained that he was on the way to the doctor and would be providing a doctor's note. Kralik did provide a note. On Friday, when trial commenced, the district court advised Kralik that they were going to limit the day to selecting a jury so that he could recuperate from any illness over the weekend. The district court stated, "[W]e're going to start opening statements and testimony on Monday because I want you to feel well enough so that you can assist [your attorney] in your defense; is that fair?" Kralik responded affirmatively. During jury selection, the district court observed Kralik participating in his defense.

Fourth, Kralik confirmed that he was rejecting the state's plea offer of 39 months and declined the district court's offer to provide him with additional time to consult with

8

his attorney. Kralik maintained his innocence throughout trial; as a result, the fact that he rejected the plea agreement did not raise competency concerns. At sentencing, the district court referred to a seven-page letter that Kralik had written to the district court in which he maintained his innocence. Kralik only argued incapacity when he moved the district court for a downward durational departure consistent with the state's original 39-month offer after he was found guilty.

Fifth, there are no competency concerns raised by Kralik's decision not to testify. The state filed a notice that it intended to impeach Kralik with his previous convictions. Kralik's decision not to testify was, if anything, consistent with his trial strategy.

Kralik's attorney did not raise competency concerns during trial, and the district court thoroughly advised Kralik of his rights and took due precautions to ensure that Kralik received a fair trial. Based on our review of the record, we conclude that the district court did not err by determining that a rule 20.01 competency examination of Kralik was not necessary.

## II.

Kralik argues, and the state agrees, that the district court erred by imposing a no-contact order as part of his executed sentence. Exclusive authority to define crimes and the range of sentences for their violation rests with the legislature. Minn. Stat. § 609.095(a) (2012). Minnesota courts "do not have inherent authority to impose terms or conditions of sentences for criminal acts and must act within the limits of their statutory authority when imposing sentences." *State v. Pugh*, 753 N.W.2d 308, 311 (Minn. App. 2008), *review denied* (Minn. Sept. 23, 2008). "Consequently, a district court

9

may not impose a no-contact order as part of an executed sentence unless the order is expressly authorized by statute." *Id.*

Kralik received an executed sentence for first-degree aggravated robbery under Minn. Stat. § 609.245, subd. 1 (2012), which provides that a person "may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $35,000, or both." Because a no-contact order is not expressly authorized by the statute, we direct the district court to vacate that order.

**Affirmed in part and remanded.**